349 F.2d 53
 Clifford McCLENEGHAN, Appellant,
v.
UNION STOCK YARDS OF OMAHA, a Corporation, Omaha Live Stock Exchange, an unincorporated association, Omaha Livestock Traders Exchange, an unincorporated association, Appellees.
 No. 17851.
 United States Court of Appeals Eighth Circuit.
 July 21, 1965.
 
 Martin A. Cannon, Omaha, Neb., for appellant.
 Alexander McKie, Jr., of Finlayson, McKie & Kuhns, Omaha, Neb., made argument for appellee Omaha Live Stock Exchange and filed brief with Barton H. Kuhns, Omaha, Neb.
 James R. McGreevy, of Crawford, Garvey, Comstock & Nye, Omaha, Neb., made argument for Omaha Livestock Traders Exchange and filed brief with Edward G. Garvey, Omaha, Neb.
 Robert L. Berry, of Kennedy, Holland, DeLacy & Svoboda, Omaha, Neb., made argument for Union Stock Yards Co. of Omaha (Limited) and filed brief with George L. DeLacy, Omaha, Neb.
 Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.
 VAN OOSTERHOUT, Circuit Judge.
 
 
 1
 This is an appeal by plaintiff McCleneghan from final judgment dismissing his antitrust complaint for treble damages brought under § 1 of the Sherman Act, 15 U.S.C.A. § 1, and § 4 of the Clayton Act, 15 U.S.C.A. § 15, against Union Stock Yards Co. of Omaha (Stock Yards), Omaha Live Stock Exchange (Live Stock) and Omaha Livestock Traders Exchange (Traders). The complaint charges that defendants in restraint of trade conspired to enforce a rule of Traders under which members flipped a coin to determine priority among themselves in bidding on stocker and feeder cattle at Stock Yards. The method of trading and the operation of the flipping system is fully described in Berigan v. United States, 8 Cir., 257 F.2d 852. In that case, we upheld the determination of the Secretary of Agriculture that the flipping practice unreasonably restricted competition in violation of Packers and Stockyards Act, 7 U.S.C.A. § 181 et seq. Shortly after our decision in Berigan, which was filed August 13, 1958, the flip system was discontinued.
 
 
 2
 The complaint alleges the conspiracy existed from October 22, 1951 until August 1958 and that plaintiff suffered actual damages as a result of the conspiracy in the sum of $130,000 and prays for damages for three times such amount.
 
 
 3
 Plaintiff appealed from a prior decision of the District Court dismissing his complaint upon the ground of lack of primary jurisdiction over the subject matter of the action. Upon the issue of antitrust violations now before us, we reversed, holding that the doctrine of primary jurisdiction did not deprive plaintiff of his right to pursue relief for violations of the Sherman and Clayton Acts. McCleneghan v. Union Stock Yards Co. of Omaha, 8 Cir., 298 F.2d 659. Much of the factual background pertinent here is set forth in that opinion. We specifically called attention to the fact that we were not determining the merits of the controversy, stating:
 
 
 4
 "Finally, we repeat and reemphasize (1) that this case has come to us in the posture of an appeal from the sustaining of the motions to dismiss and (2) that the well pleaded allegations of that complaint, for the narrow purposes of those motions, have been deemed admitted. Whether those allegations, under the demands of proof, will result in established violations of the antitrust statutes remains to be seen." 298 F.2d 659, 670.
 
 
 5
 We first direct our attention to a jurisdictional issue raised by Live Stock. Live Stock argues that the activities of the members of Traders and Livestock did not constitute interstate commerce, and, therefore, they were not subject to the provisions of the Sherman Act. In support it cites Hopkins v. United States, 171 U.S. 578, 19 S.Ct. 40, 43 L. Ed. 290, and Anderson v. United States, 171 U.S. 604, 19 S.Ct. 50, 43 L.Ed. 300, which hold that the direct effect of an agreement must restrain trade among the several states in order to come within the provisions of the Sherman Act, and that the business activities of the commission men at the Kansas City Stockyards did not have a direct effect upon interstate commerce so that their actions were not subject to the Act. However, since these decisions were written in 1898 the Supreme Court has substantially liberalized its interpretation of the powers of the Congress to regulate activities engaged in or related to interstate commerce. No longer is Congress permitted to control an activity only if it has a "direct" effect upon interstate commerce. Rather the present test would seem to be whether the activity exerts a substantial economic effect upon interstate commerce. Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122; United States v. Wrightwood Dairy Co., 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726; 15 Am.Jur.2d Commerce § 14, p. 645. Therefore, we agree with the Third Circuit that Hopkins and Anderson "do not represent what we think is the present law." Evening News Publishing Co. v. Allied Newspaper Carriers, 3 Cir., 263 F.2d 715, 718, and hold that the activities of the members of Traders and Livestock have sufficient effect upon interstate commerce so that the Act is here applicable and this court has jurisdiction.
 
 
 6
 This case was tried to a jury. At the close of plaintiff's evidence, each of the defendants moved for a directed verdict upon multiple grounds including among others in substance the following:
 
 
 7
 (1) Insufficient evidence to establish a conspiracy to violate the Sherman or Clayton Acts.
 
 
 8
 (2) No evidence to support a finding that plaintiff suffered any damage as a result of the flipping practice.
 
 
 9
 (3) Failure of proof of any causal connection between wrongful acts of defendant and plaintiff's damage.
 
 
 10
 (4) Insufficient evidence to afford a basis for determination of amount of damages.
 
 
 11
 After hearing arguments of counsel, the trial court sustained the motions of all defendants for a directed verdict. In explanation of such ruling, the trial court inter alia stated:
 
 
 12
 "If it turned on the question only of whether or not a conspiracy had been established, I might be inclined to submit that issue to you, although if I were deciding it as a matter of fact, I would hold that under the record here, and that is all I am concerned with and all that I may be concerned with, a conspiracy has not been established. But again I repeat that if that were the only issue on which my ruling or ultimate conclusion turned, I might be inclined to submit that for your consideration. However, in the face of the record here, I am convinced that under no theory under the evidence in this case has the plaintiff established the fact of damage, as we know it, and as required by law, nor has the plaintiff established by any competent evidence the extent of his damage. In other words, from this record, anyone determining the facts would have to predicate his findings, in my judgment on speculation and conjecture.
 
 
 13
 * * * * * *
 
 
 14
 "I think that the record as made here in so far as proof of the fact of damage or the extent of the damages is purely speculative, and for that reason I am going to sustain the motions as to each defendant to dismiss."
 
 
 15
 Plaintiff's action was dismissed with prejudice. This timely appeal followed.
 
 
 16
 It is apparent from the trial court's remarks that the dismissal was based upon the court's determination that plaintiff had not produced evidence to establish the fact that any damage was caused plaintiff by reason of defendant's wrongful acts. If the trial court rightly so determined, an affirmance is required. We will assume for the purpose of this opinion without so deciding that defendants were guilty of the wrongful acts charged.
 
 
 17
 Plaintiff in his brief sets out his basic contention that he has in fact suffered some damage which was caused by the defendants' wrongful acts, as follows:
 
 
 18
 "It is submitted that if denial of a turn constitutes a restraint of trade, and the law of this case says it does, then the traders whose trade is restrained by being shut out of the flip, as a matter of law is damaged every time flipping takes place.
 
 
 19
 "So McCleneghan has shown damage and must only go on to give the triers of the facts some reasonable basis to determine it."
 
 
 20
 Plaintiff claims too much. Proof of monopoly or restraint of trade and evidence that plaintiff was a customer or competitor of the wrongdoer is not sufficient in itself to support a recovery. Proof of damage to the public or to others will not without more support a finding of fact of damage caused by defendants' wrongful acts.
 
 
 21
 Courts have stated the applicable standard of proof on the fact of damage issue as follows:
 
 
 22
 "We take it that the controlling rule today in seeking damages for loss of profits in antitrust cases is that the plaintiff is required to establish with reasonable probability the existence of some causal connection between defendant's wrongful act and some loss of anticipated revenue. Once that has been accomplished, the jury will be permitted to `make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.' Bigelow v. RKO Radio Pictures, Inc., supra, 327 U.S. [251] at page 264, 66 S.Ct. [574] at page 580, [90 L.Ed. 652]. The cases have drawn a distinction between the quantum of proof necessary to show the fact as distinguished from the amount of damage; the burden as to the former is the more stringent one. In other words, the fact of injury must first be shown before the jury is allowed to estimate the amount of damage." Flintkote Co. v. Lysfjord, 9 Cir., 246 F.2d 368, 392.
 
 
 23
 To like effect, see Talon, Inc. v. Union Slide Fastener, Inc., 9 Cir., 266 F.2d 731, 736; Locke v. United States, Ct.Cl., 283 F.2d 521, 524.
 
 
 24
 "As the statutory language suggests, recovery under section 4 of the Clayton Act, as under its predecessor, § 7 of the Sherman Act, 26 Stat. 209, 210 (1890), `cannot be had unless it is shown, that, as a result of defendants' acts, damages in some amount susceptible of expression in figures resulted,' Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 165, 43 S.Ct. 47, 50, 67 L.Ed. 183 (1922). Although later Supreme Court decisions have made it plain that `a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible,' * * * and that `the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly,' * * * none has detracted from Mr. Justice Brandeis' statement in Keogh or held that mere proof that a defendant has injured its competitors generally warrants recovery in the absence of evidence that would justify a finding of injury to the particular plaintiff and would supply a rational basis for approximating its amount. To the contrary, `the jury may not render a verdict based on speculation or guesswork,' * * *." (Emphasis added.) Herman Schwabe, Inc. v. United Shoe Machinery Corp., 2 Cir., 297 F.2d 906, 909-910.
 
 
 25
 "It must be conceded that plaintiff cannot maintain an action under the provisions of § 7 of the Sherman Act, 15 U.S.C.A. § 15 Note, unless it has suffered an injury in its business or property by reason of the violation by the defendants of some of the prohibitions contained in that Act, * * *. It must show that it was injured, * * * and the mere fact that the defendants have been adjudged guilty in the Toledo case [United States v. Hartford-Empire Co., D.C., 46 F.Supp. 541] is of no avail to plaintiff unless it establishes that it sustained pecuniary damage. * * * The plaintiff must show personal, pecuniary damages, * * which must be proved by facts from which their existence is logically and legally inferable, * * *. Without actual damages to plaintiff, there can be no recovery. * * *
 
 
 26
 "Plaintiff says it has suffered an injury. It has offered no evidence to prove that it has sustained any pecuniary damage by reason of anything the defendants may have done." Turner Glass Corp. v. Hartford-Empire Co., 7 Cir., 173 F.2d 49, 51-52.
 
 
 27
 This court has considered the question of the sufficiency of the evidence to establish the fact of damage in a number of recent cases. In Duff v. Kansas City Star Co., 8 Cir., 299 F.2d 320, 322, in affirming a directed verdict for the defendant, we stated:
 
 
 28
 "Injury to `business or property' is essential to the maintenance of an action for damages under the Clayton Act. This court said, in Jack v. Armour & Co., 8 Cir., 1923, 291 F. 2d 741, 745:
 
 
 29
 `* * * On both reason and authority, no one can maintain an action under the provisions of section 7 of the Sherman Anti-Trust Act, unless he has suffered an injury in his business or property by proximate reason of the violation by the defendant or defendants whom he sues, of some of the prohibitions contained in that act; for this is what the act says in plain and simple language.'"
 
 
 30
 To the same effect, see National Wrestling Alliance v. Myers, 8 Cir., 325 F.2d 768, 777; Siegfried v. Kansas City Star Co., 8 Cir., 298 F.2d 1, 7.
 
 
 31
 We now look to the facts of this case in light of the applicable law. We of course must view the evidence and all inferences that may reasonably be drawn therefrom in the light most favorable to the plaintiff. We find no substantial evidence in the record which would support a finding that any damage age was caused plaintiff by the use of the flip system.
 
 
 32
 At the trial, plaintiff testified that he has been in the business of buying and selling cattle since 1907; that from 1937 until 1959, he was active as a trader and order buyer on the Omaha market; that his purpose in buying cattle was for his own account, for others and for his feed-lot operation; that he had two pens in the yards which would hold from 50-80 cattle; that as did other order buyers, he charged the individual that purchased the cattle 25 cents per hundred pounds and that an order buyer could buy with less expense from a commission man than from a trader; that he was present at the yards daily except during January, February and March; that whenever high class stockers and feeders were for sale there was a flip; that only members of Traders Exchange flipped; that when asked if he was able to buy first class stockers and feeders from 1951 through 1958, he answered that he had only purchased them once because the remainder of the time he did not have an opportunity to do so.
 
 
 33
 Plaintiff's evidence shows that he attempted to buy cattle only on one occasion when confronted with the flip system. This event occurred on October 22, 1951. Plaintiff had been retained by Nebergall to purchase approximately 200 head of feeder cattle. He went to Producer's alley where high quality feeders were held for sale. Two members of Traders were there and flipped. Plaintiff was denied a right to flip. Both of the Traders preceded plaintiff to the pens but did not make a purchase. Plaintiff was then invited to the pens and successfully bid for the cattle. There is evidence to the effect that when many buyers are present, sellers often hold up their price with the result that those given prior rights to bid do not always buy. Several witnesses offered by the plaintiff testified that the flip system was used on only about 10% of the cattle sales.
 
 
 34
 Plaintiff also testified with respect to an instance occurring prior to the commencement of the conspiracy here charged he went to Ryan's alley and was denied an opportunity to flip and that the party who won the flip purchased the cattle. It would seem that this isolated instance, occurring prior to the commencement of the conspiracy here, has little bearing on the issues here presented.
 
 
 35
 Since it appears from the record that plaintiff made no effort to buy when confronted with the flip system, his conclusion that the flip system denied him an opportunity to buy cattle is not persuasive, particularly when judged in the light of his success in the only attempt he made to purchase cattle when confronted with the flip. Moreover, as pointed out in Berigan, supra, p. 857 of 257 F.2d livestock is sold at the Omaha Yards by private treaty with only one person being invited to the pens to bid at one time. If no persons were present to flip or those winning the flip did not buy, farmers or dealers such as the plaintiff could go to the pens and make purchases. Absent the flip system, it is unlikely that a person such as the plaintiff making a relatively small number of purchases would be the first person invited by the commission man to make a bid.
 
 
 36
 Evidence introduced includes records showing plaintiff's income earned through cattle trading as follows:
 
 
 37
 Year No. Head Net Profit

 1946 523 $1800.98
 1947 517 2279.35
 1948 671 1860.86
 1949 240 944.54
 1953 2357 —32.14
 1954 1117 1087.34
 1955 782 2518.80
 1956 943 203.18
 1957 539 996.77
 1958 498 —2.05
 1959 516 —97.25
 1960 14 —505.40
 1961 None
 
 
 38
 There is no proof of earnings for the years 1950, 1951 and 1952, which information would be very pertinent upon the damage issue. The net profit figure submitted by the plaintiff discloses that in each of the years after the termination of the alleged conspiracy plaintiff suffered net losses. Modest profits are shown for the years 1946 to 1949, the largest being $2279.35 in 1947. Profits are shown for four of the five conspiracy years for which evidence is available. Plaintiff's largest profit for any year was $2518.80, realized in 1955.
 
 
 39
 In Wolfe v. National Lead Co., 9 Cir., 225 F.2d 427, 429-430, the court as a basis for affirming the dismissal of an antitrust suit stated:
 
 
 40
 "It will be seen from the above that appellants' net profits were much greater in the years 1947 and 1948 when the allocation of titanium was made to them under quota because of scarcity than in 1949 when they could get all the titanium they wanted. In other words, the peak years of appellants' business success were during the time they claimed to be damaged by appellees' conspiracy. Yet the first year in which they could buy the titanium without restriction, in 1949, their net income dropped and was much less than during the restricted years.
 
 
 41
 "It would seem that if appellants had conducted a more profitable business during the period of scarcity than they did in the subsequent year in which there was no scarcity, they would not have been injured by the shortage or by the allocations made to them. * * *"
 
 
 42
 Similarly here, plaintiff's business during the conspiracy was more profitable than it was after the termination of the conspiracy. Plaintiff's profits for the last preconspiracy year for which figures are given, 1949, amounted to $944.54. There is no showing as to plaintiff's operations for 1950 and 1951. Plaintiff's net profits for the conspiracy years for which evidence is available averaged more than plaintiff's net profits for 1949. Plaintiff's volume of cattle purchased was also larger during the conspiracy years than it was before and after such period.
 
 
 43
 Plaintiff also attempted to establish the fact of damage by showing profits of other dealers on the market who were members of Traders and hence entitled to flip. There is no satisfactory evidence that such Traders' business was comparable to plaintiff's. It would seem that many of the other traders handled a considerably larger volume than plaintiff. Several of the traders who testified stated that they purchased the larger portion of their cattle from sources outside the Omaha Stock Yards. There is no testimony as to plaintiff's expertise as a judge of quality and value of cattle as compared to that of the other operators. Plaintiff's capital and economic position as a buyer is not disclosed. There is no showing that plaintiff had created any substantial good will as a dealer or that he had an established line of satisfied customers. The only customer identified in the record is Nebergall, for whom plaintiff completed a successful transaction. Included in the record is an exhibit showing the volume, gross profit and net profit of some 41 traders operating on the Omaha market in the year 1955. During such year, their profits varied from $9.92 per head to a loss of 58¢ per head. Fourteen of the operators made a net profit of less than $1.00 per head. Thus, it is apparent that factors other than the flip could well account for the variance in profits made by an operator.
 
 
 44
 Plaintiff's evidence as to volume of cattle which he handled before and after the conspiracy period and with respect to his method of doing business makes the evidence of profits of other operators of little relevancy on the damage issue.
 
 
 45
 A careful consideration of the entire record leads us to the conclusion that the trial court correctly determined that plaintiff has failed to establish the fact that he suffered any damage which was caused by defendants' alleged wrongful acts. The resolution of this issue is dispositive of this appeal. No purpose will be served in discussing other issues raised by the parties.
 
 
 46
 The judgment appealed from is affirmed.