**DEAN FOODS COMPANY, Inc., Appellant,**

**v.**

**ALBRECHT DAIRY COMPANY, Appellee.**

**No. 18937.**

United States Court of Appeals Eighth Circuit.

June 5, 1968.

Francis J. McConnell, of McConnell, Freeman, Curtis & McConnell, Chicago, Ill., for appellant; Strom & Strom, Cape Girardeau, Mo., were on the brief and reply brief with Francis J. McConnell, Chicago, Ill.

Gray L. Dorsey, Chesterfield, Mo., for appellee; Hux & Green, Sikeston, Mo., were on the brief with Gray L. Dorsey, Chesterfield, Mo.

Before MATTHES, MEHAFFY and LAY, Circuit Judges.

MATTHES, Circuit Judge.

In 1959 the State of Missouri adopted an Unfair Milk Sales Practices Act[1] designed to regulate the sale of milk and related milk products by processors, distributors and non-processing retailers, all of whom are defined in Section 416.410 of the Act.

Of particular importance here are Sections 416.415 and 416.455. Section 416.415 provides in pertinent part:

> "1. No processor or distributor shall, with the intent or with the effect of unfairly diverting trade from a competitor, or of otherwise injuring a competitor, or of destroying competition, or of creating a monopoly, advertise, offer to sell or sell within the State of Missouri, at wholesale or retail any milk products for less than cost to the processor or distributor."

Section 416.455 authorizes recovery of treble damages for economic losses sustained as a result of a violation of the Act.

This litigation brings into focus Section 416.415. Suit was instituted by Albrecht Dairy Company, a Missouri corporation, (hereinafter referred to as Albrecht or plaintiff) against Dean Foods Company, Inc., a Michigan corporation having its principal place of business in Memphis, Tennessee (hereinafter referred to as Dean or defendant). Plaintiff sought to recover treble damages for losses sustained by reason of Dean's sale of Milk for less than cost in the City of Cape Girardeau, Missouri, hereinafter sometimes referred to as the Cape. Both corporations are distributors within the meaning of the Act. A trial before Judge Meredith without a jury resulted in a finding that Dean had violated Section 416.415 of the Act and that plaintiff had sustained actual damages in the amount of $15,402.65, for which a judgment was entered in the trebled amount of $46,207.95. Albrecht Dairy Company, Inc. v. Dean Foods Company, Inc., 269 F.Supp. 329 (E.D.Mo.1967).[2] Defendant has appealed.

The basic questions at issue in the trial and on appeal are: (1) whether defendant violated the provisions of Section 416.415; (2) whether plaintiff was damaged as a result of such violation and, if so, the amount of such damage.

The Act or aspects thereof have been before the Missouri Supreme Court on four occasions. None, however, involved a claim for damages. In that respect, this is a case of first impression.

1. Missouri Revised Statutes, §§ 416.410–.560 (1959). Hereinafter all statutory references will be to Vernon's Annotated Missouri Statutes.

2. The suit was filed in the Missouri Court of Common Pleas and was removed by defendant to the United States District Court.

The Act survived an attack on its constitutionality in Borden Company v. Thomason, 353 S.W.2d 735 (Mo.1962). State ex rel. Thomason v. Roth, 372 S.W. 2d 94 (Mo.1963), involved a proceeding by the Missouri Commissioner of Agriculture to enjoin the alleged illegal practices of a non-processing milk retailer in selling milk below cost in violation of Section 416.425 of the Act. In State ex rel. Thomason v. Adams Dairy Company, 379 S.W.2d 553 (Mo.1964), the Commissioner of Agriculture sought to enjoin Adams' free distribution of milk allegedly in violation of Section 416.440. At issue in the last case, Foremost Dairies, Inc. v. Thomason, 384 S.W.2d 651 (Mo. 1964), was the validity of rules and regulations promulgated under the Act by the Commissioner of Agriculture.

Dean's nine specifications of error may be placed in two categories. The first three relate to the issue of liability. The remaining six deal with various facets of the issue of damages.

The District Court's opinion accurately portrays the essential facts. This case had its genesis in a price clash between Dean and Sunny Hill Dairy, a competing distributor of milk products in the Cape area. Sunny Hill entered the Memphis, Tennessee market, which was served in part by Dean, in March, 1964 at a price lower than the prevailing price in that City.[3] Dean retaliated by entering the Cape market.[4] In April, 1964 Dean applied for a permit to deliver and sell milk in Cape from its Chemung and Huntley, Illinois plants. In May, 1964 Dean applied for a permit for its Memphis plant. Being unsuccessful in both applications, it negotiated a contract on September 25, 1964 with Valley Farm Dairy, Inc. of St. Louis, Missouri to process and package half gallon containers of milk under the Dean label and deliver the same to a designated dock in Cape. Valley Farm obtained the necessary permit for such operation. This enabled Dean to enter the Cape market on October 7, 1964. At that time and for three or four years prior thereto, the prevailing wholesale price, with a possible variation of one or two cents, for a half gallon of homogenized milk was forty-one cents. Dean sold and delivered milk upon its entry into Cape at thirty-four and one-half cents per half gallon. At the threshold of the trial Dean stipulated that its price of thirty-four and one-half cents per half gallon was less than its unit cost for a half gallon of milk. By way of interrogatories it was disclosed that Dean lost money during every month of its operation in Cape.[5]

The marked cut in milk prices had a telling effect. Other dairies serving that City, which included, in addition to plaintiff, Adams, Pevely, Sealtest, Midwest and Sunny Hill, were compelled to reduce their price to approximately the level of Dean's price.

Albrecht was a relatively new distributor in Cape and several other nearby cities. It had been in business only since

3. The prevailing Memphis wholesale price for half gallons of milk at that time was 34.5 cents. Sunny Hill Dairy disrupted the existing price structure by delivering half gallons of milk for 28.8 cents wholesale. Sunny Hill sold only half gallons of milk, and maintained a 28.8 cents wholesale price despite the cost of delivering the milk from Cape Girardeau to Memphis, a distance of 180 miles. As a result of Sunny Hill's entry into the Memphis market Dean filed suit in May, 1964 against Sunny Hill in the Federal District Court in Memphis, alleging that the latter was guilty of a territorial price discrimination in violation of Section 2(a) of the Clayton Act.

4. The record discloses that approximately seventy-five percent of Sunny Hill's sales are in the Cape Girardeau market.

5. Dean's monthly losses from its Cape operations were as follows:

| *MONTH* | *LOSS* |
|---|---|
| October, 1964 | $490.98 |
| November, 1964 | 494.27 |
| December, 1964 | 695.08 |
| January, 1965 | 593.24 |
| February, 1965 | 535.11 |
| March, 1965 | 536.75 |
| April, 1965 | 588.00 |
| May, 1965 | 555.61 |
| June, 1965 | 555.25 |
| July, 1965 | 606.13 |
| August, 1965 | 626.97 |

July, 1964[6] and was the last to enter the Cape area prior to Dean. Its annual volume for the fiscal year ending June 30, 1965 amounted to $175,000. With this volume it operated at a loss, although it was striving to enlarge its output to show a profit at the time of Dean's advent.

Dean's below cost price prevailed from its entry into Cape until the time of the trial in November, 1965. It made no effective campaign to generate an increase in its volume of business. Nevertheless, the course it pursued adversely affected plaintiff's economic interests. The latter attempted during the period in question to increase its prices, but in order to retain its customers and remain in business it was required to meet Dean's price.

Judge Meredith calculated plaintiff's damages by multiplying the number of units sold during the damage period by its loss on each unit sold. Plaintiff's loss represented the difference between the price prevailing on October 7th when Dean entered the market and the price it was compelled to charge after that date. Applying this formula to the evidence he found plaintiff's damage to be $15,402.65. 269 F.Supp. at 333.

## THE LIABILITY ISSUES

■ The crucial question relating to the liability issue is whether Dean's operation was accompanied "with the intent or with the effect of unfairly diverting trade from * * * or of otherwise injuring a competitor." Mo.Stat. Ann. § 416.415.

■ The question of intent ordinarily presents an issue of fact to be resolved by the court or the jury. Therefore, unless we can conclude with assurance that the evidence conclusively demonstrates a lack of the requisite intent, we are not inclined to set aside the District Court's findings as clearly erroneous. The Supreme Court of Missouri, in sustaining the Act, has recognized that each case must be determined on the peculiar facts and circumstances presented:

> "Whether an act is committed with the intent or with the effect of 'unfairly diverting trade from a competitor', the court is of course competent to decide and to give a reasonable definition and construction of the words used when a proper case is presented. Whether or not a sale below cost has unfairly diverted trade is a matter of proof in each instance and must depend on the facts and circumstances shown. The provision is subject to a reasonable interpretation." Borden Company v. Thomason, supra, 353 S.W.2d at 754.

See also State ex rel. Thomason v. Adams Dairy Company, supra, 379 S.W.2d at 556.

We have carefully examined the record and find substantial evidence therein from which the trier of fact could reasonably conclude that Dean sold its half gallons of milk below cost with the requisite unlawful intent. In reaching this conclusion we note in particular the following significant facts.

In contrast to either Albrecht or Sunny Hill, which were essentially local dairies, Dean's milk and related dairy product operations were quite extensive. During the year 1964 Dean, its parent company and subsidiaries, operated in eleven states and did a gross business of $72,000,000.00.

Dean's general sales manager, Mr. Tom T. Thompson, who made the decision to enter the Cape market, testified that he knew that Sunny Hill had a high percentage of its total sales in Cape Girardeau and that the foreseeable effect of Dean's entry at a lower price would be to force its competitors, including Albrecht, to lower their prices proportionately. The inference is clear that Dean had in fact the capacity to sell at a loss for an extended period of time with little,

6. Robert J. Albrecht, president of plaintiff, operated the dairy business as a sole proprietorship since 1963, and incorporated on July 11, 1964.

if any, detrimental effect on its overall business.

Other factors similarly point to Dean's unlawful intent in entering the Cape market. Following Sunny Hill's entry into the Memphis market Dean was prompted to expand its milk operations to the Cape area. This was not, however, the result of a normal corporate expansion. Dean had previously distributed its products in the "Boot Heel" area of Missouri but had withdrawn from that market in 1961 or 1962. Although Dean had expanded its distribution network west of the Mississippi River as far north as Blytheville, Arkansas, near the southeast border of Missouri, at no time did it consider the Cape Girardeau market or attempt to penetrate at all into southeast Missouri.

Prior to Dean's entry Thompson made no effort to survey the market beyond Cape Girardeau proper. He failed to check with any other county or city to determine whether Dean could acquire a permit or whether a permit was necessary. He ignored entirely the adjoining areas of southeast Missouri. Dean's sales representatives were likewise instructed to concentrate their activities in the Cape area and made no attempt to expand the distribution of Dean products beyond that point. With the exception of two small wholesale accounts in Jackson, Missouri, Dean sold its products exclusively in Cape Girardeau.

Another indication of Dean's intent to injure can be found in the fact that Dean entered the Cape market at a wholesale price significantly below the prevailing competitive price. As stated, the market price was forty-one cents per half gallon at the time of Dean's entry and had remained at this price within a range of one or two cents for the past three or four years; Dean nonetheless entered the market at thirty-four and one-half cents, some six cents below the prevailing price. This disparity in price assumes greater significance when considered in light of the uncontradicted testimony of Dean's sales representatives that Dean normally entered a new market at the prevailing competitive price.[7]

Dean's method of distribution similarly discounts its good faith entry into the Cape market. On the eve of its venture defendant employed an inexperienced twenty-year old farm boy, Vernon C. Daume, at seventy-five dollars per week, to drive a delivery truck and distribute its half gallon containers to its wholesale accounts. In contrast to other markets where it had operated either through independent distributors or had used company-owned trucks to distribute its products, Dean leased a refrigerated truck from Hertz Rental Company at a rental fee of $52.00 per week plus nine and one-half cents per mile.[8]

Although part of Daume's duties was to solicit new wholesale accounts, there is no indication that he actively endeavored to sell Dean products. He was supposed to work a full day, but devoted on the average only two hours a day in Dean's employ. Dean's representatives made no effort to determine whether he was fulfilling the responsibilities of his employment, nor did they actively encourage him to solicit new business.[9] Mr. Thompson stated that he merely assumed that Daume was diligently performing his duties.

By the time of trial the number of Dean's wholesale accounts had dwindled from twelve to seven. This circumstance,

7. Mr. Hoffman testified to the effect that Dean normally promoted its products primarily on the basis of quality and service, and not price.

8. Dean contended that the rental of the truck and Daume's $75.00 per week salary constituted a major portion of the extraordinary high per unit cost that caused it to operate at a deficit.

9. Daume stated that he was required to send a daily report to Dean, but was not required to indicate therein potential customers whom he had solicited.

however, was virtually ignored by Dean's management. Despite this reduction little effort was made to stimulate Dean's advertising and promotional activities. The conclusion is apparent that Dean abdicated the responsibility for the solicitation of new business to an inexperienced farm boy.

We also attach some significance to Dean's entry with only a single product. Several of its sales representatives conceded that Dean was at a competitive disadvantage without a full product line. The record is replete with testimony that a greater diversification would have generated a greater volume of business. This factor belies the contention that Dean intended to enter the Cape market on a permanent basis. Although Dean argues that it was unable to introduce a full line of milk and other dairy products by reason of its inability to secure the requisite permits for its out of state plants and Valley Farm's failure to meet its processing standards, there is no showing that Dean made any attempt to purchase a diversified line of dairy products from dairies other than Valley Farm. The manager of Valley Farm Dairy stated that Dean's quality control representative approved, with minor exceptions, Valley's dairy operations for the distribution of other products under the Dean label, and that Mr. Thompson had negotiated with him for distribution of other products. Dean, however, apparently made little or no effort to work out these minor differences and negotiations consequently lapsed.

From these and other circumstances the District Court could readily draw the inference that Dean did not make a bona fide effort to enter the Cape Girardeau market for the purpose of expanding its territory and making a profit from its sales. Indeed, in considering the evidence, the District Court logically concluded that Dean entered the Cape market with the intent or effect of unfairly diverting trade from a competitor.

## THE DAMAGE ISSUES

Defendant contends that notwithstanding its violation of the Missouri Act Albrecht did not in fact sustain any damage by reason of such violation. Alternatively, it argues that Albrecht's damage, if any, must be limited to those "individual competitive situations" where it actually met Dean's one-half gallon price.

Section 416.455 of the Act provides in pertinent part:

> "Any person who is injured in business or property by reason of another person's violation of any provision [of this Act] * * * may bring a separate action and recover three times the actual damage sustained as a result of the violation. * * *"

This provision is identical in substance to Section 4 of the Clayton Act, 15 U.S.C. § 15. Decisions under this Section and former Section 7 of the Sherman Act recognize a distinction between the burden of proof required to establish the fact of damage and that necessary to show the amount:

> "[T]here is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect to their amount." Story Parchment Company v. Paterson Parchment Paper Company, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).

We followed this rule in McCleneghan v. Union Stock Yards of Omaha, 349 F.2d 53 (8th Cir. 1965), where we quoted from Flintkote Company v. Lysfjord, 246 F.2d 368, 392 (9th Cir. 1957), cert. de-

nied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed. 2d 46 (1957):

> "The cases have drawn a distinction between the quantum of proof necessary to show the *fact* as distinguished from the *amount* of damage; the burden as to the former is the more stringent one. In other words, the *fact* of injury must first be shown before the jury is allowed to estimate the *amount* of damage." 349 F.2d at 56.

Defendant presents a two-prong approach to the claim of no damage. First, we are told that since plaintiff did not lose any retail customers or sustain a loss in gross profits after Dean entered the Cape market, it failed to carry the burden of establishing the fact of damage. We do not agree. Mr. Albrecht indicated that even though plaintiff had not shown a net profit it nonetheless had experienced a continual growth in sales both prior to and after Dean's entry. There is nothing to indicate that Albrecht's volume would not have increased if the prices prevailing before October 7th had remained in effect.[10] Albrecht maintained an accurate record of each sale consummated during the period subsequent to October 7th. The undisputed evidence proves that on all sales Albrecht received less per unit than it would otherwise have derived if Dean's action had not depressed milk prices in the affected area. In sum a realistic appraisal of all of the circumstances refutes the contention that as a matter of law no damage was sustained. This was an issue of fact, and the Court's finding that plaintiff was damaged is not clearly erroneous. We are familiar with the principles set forth in American Infra-Red Radiant Co. v. Lambert Industries, Inc., 360 F.2d 977, 995 (8th Cir. 1966), cert. denied, 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966); Duff v. Kansas City Star Company, 299 F.2d 320, 322 (8th Cir. 1962); and Siegfried v. Kansas City Star Company, 298 F.2d 1, 7 (8th Cir. 1962), cert. denied, 369 U.S. 819, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962), to the effect that a treble damage plaintiff must show a causal relationship between the defendant's illegal acts and some actual monetary injury to his business or property. We believe Albrecht has amply sustained that burden.

Defendant next presents the ingenious but illogical theory that plaintiff cannot recover damages because its own below cost sales were equally a violation of the Act. Its argument here is essentially twofold. On the one hand, it submits that Albrecht's reduction in price after Dean's entry to thirty-four and one-half cents per half gallon, coupled with its 2% discount, was not a good faith attempt to meet competition, but rather an unlawful extension of Dean's price, and therefore a violation of the Act. It argues further that since Albrecht's dairy operations did not reflect a net profit either before or after Dean's entry, plaintiff's sales were likewise below cost.[11] and therefore prima facie evidence of a violation of the Act.

As plaintiff observes, Section 416.445 does exempt from the provisions of the Act price reductions "made in good faith to meet the equally lower price of competition * * *."[12] Contrary to Dean's

10. All competing dairies were forced to meet Dean's below cost price. The record does not show the actual effect upon the other dairies.

11. Section 416.410 defines cost to the processor or distributor as:
"the price paid for raw materials, plus the cost of doing business, which shall include labor, salaries paid executives and officers, rent, interest, depreciation, power, supplies, maintenance of equipment, selling costs, advertising, transportation and delivery costs, credit losses, all types of permits and license fees, all taxes, insurance, and all overhead expenses of the processor or distributor;"

12. Section 416.445 provides in pertinent part:
"The provisions of Sections 416.415 to 416.430 do not apply to advertisements, offers to sell or sales where:
"(6) The price of the item is made in good faith to meet the equally lower price of competition, provided however,

claim, however, Albrecht's reduction in price was the natural response to a competitive situation. Mr. Albrecht, as well as other dairy processors in the Cape market, testified that they were forced to meet the price level set by Dean in order to stay competitive. In view of Albrecht's already precarious position in the market conformity to the new price structure was a matter of survival. It did not capitulate immediately. On October 9th, two days after Dean had set the price and other dairies had followed suit, Albrecht was forced to lower its price proportionately. The fact that plaintiff retained its 2% discount in addition to its new thirty-four and one-half cents price, thus undercutting Dean's price by a small margin, does not deprive it of the protection afforded by the meeting of competition proviso, inasmuch as its reduction in price was competitively motivated. In short, there is not a scintilla of evidence to justify the inference that Albrecht's pricing practices after Dean's entry were formulated with the intent to injure or adversely affect a competitor, and therefore its below cost sales do not violate the Act.

We have considered the cases [13] upon which Dean relies and find them inapposite to the factual situation before us and therefore not controlling.

Dean also questions the amount of damages allowed by the District Court. It contends that the District Court improperly took into consideration as part of the damage award the following factors:

1. Albrecht's loss from price reductions on units other than those sold by Dean.

2. Albrecht's loss in markets other than Cape Girardeau, since Dean confined its operations to that City.

3. Losses up to the date of trial.

Additionally, Dean argues that the District Court failed to reduce its damage computation by the 12% commission which Albrecht would have otherwise have paid to its drivers on additional revenue earned had it received the home delivery prices prevailing before Dean's entry, and that the amount of damages therefore should be reduced by $1,785.00, or $5,355.00 when trebled.

We reject all of these contentions.

It is settled law that once the fact of damage has been established courts are allowed considerable leeway in arriving at the amount of damages. This principle was firmly recognized in Eastman Kodak Company of New York v. Southern Photo Materials Company, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), where the Supreme Court stated:

> " 'Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate.' * * * Furthermore, a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages

the person charged with a violation of this section further affirmatively proves the reduction in price is not made with the intent or with the effect of unfairly diverting trade from a competitor, or of otherwise injuring a competitor, or of destroying competition, or of creating a monopoly, and unless such is affirmatively shown, the court shall enter its order enjoining the violation as charged."

13. Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 250, 71 S.Ct. 240, 95 L.Ed. 239 (1951); Federal Trade Commission v. A. E. Staley Manufacturing Co., 324 U.S. 746, 753–754, 65 S.Ct. 971, 89 L.Ed. 1338 (1945); Page v. Bakersfield Uniform & Towel Supply Co., 239 Cal.App.2d 762, 49 Cal. Rptr. 46, 53 (1966); Obrecht v. S. Kotzin Co., 1950–51 Trade Cas., ¶ 62,694 (Cir.Ct.Md.1950); Minnesota v. Kohn, 1960 Trade Cas., ¶ 69,664 (Dist.Ct. Minn.1958); Safeway Stores v. Oklahoma Retail Grocers Ass'n., 322 P.2d 179, 181, 70 A.L.R.2d 1068 (Okl.1957), aff'd, 360 U.S. 334, 79 S.Ct. 1196, 3 L.Ed.2d 1280 (1959); Hogue v. Kroger Company, 213 Tenn. 365, 373 S.W.2d 714, 718 (1963).

suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible." 273 U.S. at 379, 47 S.Ct. at 405.

Accord, Story Parchment Company v. Paterson Parchment Paper Company, supra; Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

We hold that the District Court properly refused to limit plaintiff's damages to those "individual competitive situations" where Albrecht actually met Dean's half gallon price. There is an abundance of uncontradicted testimony establishing that there was a correlation between the price of half gallon and other size units. One dairy processor stated that the half gallon was generally the basic pricing unit and that larger and smaller units, such as gallons and quarts, were priced proportionately. In view of this price correlation and the absence of any price differential between out-of-store and home delivery sales [14] Albrecht's measure of damages properly included its price reductions to both wholesale and home delivery customers.

Neither do we find merit in Dean's argument that plaintiff's damages must be confined to its operations in the Cities of Cape Girardeau and Jackson, the only markets served by Dean. Milk prices in adjoining markets of reasonably close proximity to Cape were in fact controlled by the prices in Cape. This necessarily compelled a reduction in prices in these areas with a consequential loss to plaintiff.[15]

From our analysis of the record, in particular the post-trial depositions, we are not convinced that the evidence relating to the payment of commissions compels the conclusion that the Court erred in the amount of its overall allowance. The Supreme Court has indicated that the amount of damages need not be measured with exactness and precision. Bigelow v. RKO Radio Pictures, Inc., supra; Eastman Kodak Company v. Southern Photo Materials Company, supra. We will not therefore invalidate the District Court's damage award merely because it fails to correspond exactly to plaintiff's net loss of revenue, the amount of which would be subject to difficult, if not impossible, computation.

In light of these controlling pricing practices, and the liberality accorded to the courts in fixing the measure of damages, we approve the formula adopted by the District Court in arriving at the amount of actual damages.

Finally, defendant submits that the District Court erred in allowing damages up to the date of trial. It argues that plaintiff may not recover damages beyond the date of filing of the complaint, July 20, 1965, and that therefore the judgment should be reduced by the amount of the post-complaint damages.

Appellant's conception of the law is correct. Damages are limited to the date of filing of the complaint and may be recovered beyond that date only where it is shown that they have resulted from the original illegal acts which were the subject of the complaint. Lawlor v. Loewe, 235 U.S. 522, 536, 35 S.Ct. 170, 59 L.Ed. 341 (1915); Elyria-Lorain Broadcasting Co. v. Lorain Journal Co., 358 F.2d 790, 794 (6th Cir. 1966).

14. Mr. Albrecht stated that with the exception of the Cape market home delivery service normally commanded a premium over the out-of-store price. Home delivery service accounted for about 95% of Albrecht's sales. If the store and home delivery prices of milk were approximately the same, a radical reduction in the price of the former would all the more affect the pricing of the latter, even though Dean did not compete at this level of trade.

15. Thus in Illmo and Scott City, Missouri, some six to ten miles beyond Cape, the price of milk followed the pattern set in Cape, whereas in Perryville, Missouri, thirty-five miles from Cape Girardeau, the price was unaffected.

Counsel for plaintiff agree with the rule. They assert, however, that it has no application for the reason that evidence of damages to the date of trial was admitted without objection. In short, they seek application of Rule 15 (b), Fed.R.Civ.P., which provides in part:

> "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."

Our canvass of the record leads us to the conclusion that the issue of damages during the period following the filing of the complaint was fully developed and tried without objection. On direct examination, Mr. Albrecht, president of plaintiff, testified in detail to his sales and prices during the post-complaint period. Defendant did not challenge this testimony on any ground. Representatives of other competing dairies also testified, without objection, to their post-complaint sales and prices. Dean's divisional sales manager and vice president, Mr. Thompson, in response to questions by Dean's counsel, testified to his company's pricing in the Cape Girardeau area in August and October, 1965. Additionally, Dean offered into evidence exhibits summarizing price changes by competing dairies Pevely, Sealtest, Sunny Hill and Adams before and after the complaint.

More importantly, an exhibit showing Albrecht's sales and gross operating profits from July 1, 1964 to September 30, 1965 was offered by Dean and admitted into evidence.[16]

The question at hand was first raised after the trial had been concluded. Near the conclusion of plaintiff's case the parties stipulated that because of discrepancies in the original damage statement prepared by plaintiff's accountant, an exhibit accurately reflecting plaintiff's operations after Dean's entry would be filed with the court. During the proceedings the following colloquy ensued:

> "Mr. McConnell (counsel for defendant): Your Honor, is it understood that this correction of the exhibit will be limited to simply correcting the figures and not changing the legal theory or submitting some different kind of exhibit?
>
> "Mr. Riddle (counsel for plaintiff): There will be no change in the legal theory, Your Honor.
>
> "Mr. McConnell: They are simply going to make the corrections?
>
> "The Court: Corrections on the figures.
>
> "Mr. McConnell: On the prices and on the units.
>
> "The Court: That is right. Then if the defendant desires to have an accountant come down and examine these books of Mr. Albrecht's I will expect them to be made available to him without any notice or anything else on that."

After the amended damage exhibit covering the period of October 1, 1964 to November 26, 1965 had been filed by plaintiff, Dean, for the first time, raised the present question in its "Objections to Plaintiff's Damage Exhibits."

On the basis of the trial proceedings defendant's objections were not timely raised. Here, if ever, the issue under consideration was fully tried with the implied consent of the defendant. In this posture, the District Court properly allowed damages for the post-complaint period.

16. We also take note that interrogatories submitted to Dean on September 27, 1965 sought information relating to its operations in Cape subsequent to the date of the complaint. No objection was tendered on the ground that the post-complaint conduct was irrelevant. To the contrary, the interrogatories were answered.

In summary, the record supports the Court's findings and conclusions on all issues. We find no basis for setting aside its judgment.

Affirmed.