ADMIRAL THEATRE CORPORATION, a Nebraska Corporation, Benson Drive-In Corp., a Nebraska Corporation, and the Chief Theatre Corp., a Nebraska Corporation, Plaintiffs,

v.

The DOUGLAS THEATRE COMPANY, a corporation, Russell Brehm, an Individual, J. S. B. Amusement Corporation of Nebraska, a corporation, Sarge Dubinsky, an Individual, Irwin Dubinsky, an Individual, Mann Theatres Corporation of California, a corporation, Theodore Mann, an Individual, American Multi-Cinema, Inc., a corporation, Stanley Durwood, an Individual, Cooper Theatres, Inc., a corporation, Elwood Thompson, an Individual, Herman Hallberg, an Individual, Northwest Cinema Theatre Corporation, a corporation, Melvin Lebewitz, an Individual, Exhibitor-Defendants, and also, Universal Pictures, a corporation, Paramount Pictures, a corporation, Warner Brothers Distributing Corporation, a corporation, Columbia Pictures Industries, Inc., a corporation, Allied Artists Pictures Corporation, a corporation, Twentieth Century-Fox Film Corporation, a corporation, Avco Embassy Pictures Corporation, a corporation, Distributor-Defendants.

Civ. No. 74-0-82.

United States District Court,
D. Nebraska.

Aug. 24, 1977.

Richard K. Lydick, Zweiback & Laughlin, Omaha, Neb., Earl A. Jinkinson, Robert Foster, Greg Murray, Winston & Strawn, Chicago, Ill., for Admiral Theatre Corp., Benson Drive-In Corp. and the Chief Theatre Corp., plaintiffs.

Leo Eisenstatt, Steven M. Luttbeg, Eisenstatt, Higgins, Kinnamon & Okun, Omaha, Neb., Alan K. Benjamin, Bagby, Benjamin & Arnold, Kansas City, Mo., for The Douglas Theatre Co., Russell Brehm, J.S.B. Amusement Corp. of Nebraska, Sarge Dubinsky, Irwin Dubinsky, American Multi-Cinema, Inc., and Stanley Durwood, exhibitor-defendants.

Bernard R. Kaufman, C/O Mann Theatres Corp., Los Angeles, Cal., Richard A. Knudsen, Kenneth C. Stephan, Knudsen, Berkheimer, Endacott & Beam, Lincoln, Neb., for Mann Theatres Corp. of California, Theodore Mann, Cooper Theatres, Inc., Elwood Thompson and Herman Hallberg, exhibitor-defendants.

Patrick W. Healey, John Tavlin, Healey, Healey, Brown, Wieland & Burchard, Lincoln, Neb., D. Randall Blohm, Minneapolis, Minn., for Northwest Cinema Theatre Corp., and Melvin Lebewitz, exhibitor-defendants.

William E. Morrow, Jr., Richard N. Janney, Donald Buresh, Swarr, May, Smith & Andersen, Omaha, Neb., for Universal Pictures, Paramount Pictures, Warner Brothers Distributing Corp., Columbia Pictures Industries, Inc., Allied Artists Pictures Corp., Twentieth Century-Fox Film Corp., and Avco Embassy Pictures Corp., distributor-defendants.

## MEMORANDUM IN SUPPORT OF ORDER OF DIRECTED VERDICT

HANSON, Chief Judge.*

This is an action by motion picture theatre corporations against motion picture distributors and exhibitors to recover damages for, and obtain injunctive relief from, alleged violations of Sections 1 and 2 of the Sherman Act.[1] Plaintiffs' complaint alleges that between March 15, 1970 and March 15, 1974 there existed in the Omaha, Nebraska-Council Bluffs, Iowa market area an

---

* William C. Hanson, District Judge, Northern and Southern Districts of Iowa, sitting by special designation to the District of Nebraska at Omaha, Nebraska.

1. Section 1 (15 U.S.C. § 1) provides in pertinent part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal . . . .

Section 2 (15 U.S.C. § 2) provides in pertinent part:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony.

overall conspiratorial arrangement, between and among all distributor and exhibitor defendants, which unlawfully interfered with plaintiffs' ability to obtain first-run motion pictures for their Omaha theatres. Jurisdiction is predicated upon Sections 4 and 16 of the Clayton Act and are not in dispute.[2]

At this stage of the proceedings, with plaintiffs having rested their case, there remain pending before this Court several motions. More specifically, these motions include (1) defendants' motions to disqualify plaintiffs' expert and preclude said expert's testimony, filed July 18, 1977; (2) defendants' motions for mistrial, filed July 18, 1977; (3) defendants' motions for directed verdict, filed July 21, 1977; and (4) plaintiffs' motion to admit evidence as to all defendants, filed August 3, 1977. Of primary concern to this Court are defendants' motions for directed verdict filed pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, and it is to these motions that this memorandum directs its focus. The Court, after thoroughly reviewing plaintiffs' evidence and the parties' written arguments, has concluded that the motions for directed verdict are of merit and must be sustained in their entirety. With these motions sustained, all other pending motions, only briefly mentioned herein, are rendered moot.

## I.

## PRETRIAL PROCEEDINGS

The Court, prior to addressing the motions for directed verdict, digresses to note the historical development of this case. Such background places the present ruling in its proper context and further suggests an underlying reason for the inability of plaintiffs' case to survive directed verdict motions.

Plaintiffs filed their complaint in the United States District Court for the District of Nebraska on March 15, 1974. Nearly three years later, on January 17, 1977, this Court, pursuant to 28 U.S.C. § 292(b), was designated by the Chief Judge of the United States Circuit Court of Appeals for the Eighth Circuit to complete the processing and trying of plaintiffs' cause of action. This Court, on January 28, 1977, accordingly ordered that all parties were to appear for a final pretrial conference on February 22, 1977. At that pretrial conference, it became apparent that the lawsuit and attendant discovery proceedings, for whatever reason, had been essentially stalled for almost a year. Without assessing blame for the inaction, the Court, attempting to ensure justice for all party litigants, adjusted its schedule and permitted the plaintiffs additional time to conduct further discovery. While the scope of plaintiffs' discovery requests were necessarily limited, both in fairness to the defendants and so as to complete the trial within the Court's out-of-district time designation, they were given considerable latitude in their exploration of defendants' alleged conspiratorial activities. Defendants' motions to limit proof at trial to those first-run films upon which plaintiffs had made demand were overruled, and plaintiffs were confined only to first-run films released in the Omaha-Council Bluffs market area between March 15, 1970 and March 15, 1974.

---

**2.** Section 4 (15 U.S.C. § 15) provides in pertinent part:

[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

Section 16 (15 U.S.C. § 26) provides in pertinent part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . as against threatened loss or damage by a violation of the antitrust laws, . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue . . . . .

■ After these rulings, which were filed in March of 1977, the proceedings were marked by plaintiffs' failure to meet Court imposed deadlines and to take full advantage of those further discovery opportunities that had been permitted. The Court does not herein raise plaintiffs' dilatoriness and inadequate trial preparation, which the record fully documents and which in itself would have been sufficient grounds to dismiss the case, for the purpose of coloring or lending support to its present ruling; rather, it is to suggest that a contributing reason, if not indeed a major reason, for plaintiffs' inability to survive directed verdict motions is that the foundation upon which they attempted to build their case was incomplete and unsound. For that, and the case's subsequent collapse, plaintiffs have only themselves to blame.

## II.

### PLAINTIFF'S EVIDENCE

In considering defendants' motions for directed verdict, the Court, before appraising the legal contentions, reviewed plaintiffs' evidence and has determined that the following enumerated facts are not in dispute or are facts upon which reasonable persons would not disagree. See Fed.R. Civ.P. 50(a); *5A Moore's Federal Practice* ¶ 50.02[1]. A few of these fact enumerations are of a descriptive nature, seeking merely to identify controverted evidence that plaintiffs undeniably offered in support of their case.

1. The plaintiffs are three Nebraska corporations which owned theatres and exhibited first-run motion pictures in the Omaha, Nebraska-Council Bluffs, Iowa, market during the time period in question, March 15, 1970 to March 15, 1974. Specifically, plaintiffs, whose exhibition of motion pictures was confined to Omaha, are known as the Admiral Theatre Corporation, the Chief Theatre Corporation, and the Benson Drive-In Corporation, and said plaintiffs owned and operated the Admiral Theatre, the Chief Theatre, and the Skyview Drive-In, respectively.

2. Plaintiffs are incorporated in the State of Nebraska, with all stock through-out the period being owned by Ralph Blank or members of his immediate family. Ralph Blank, his wife, Geraldine, and his son, Robert, all participated in the operation of plaintiff theatres during the period between March 15, 1970 and March 15, 1974. While Ralph Blank was the principal operating officer for all three theatres, Robert Blank's responsibilities increased after his father's heart attack in the spring of 1971. Since the death of Ralph Blank in November, 1976, Robert Blank has become the principal operating officer for the Admiral and Skyview theatres.

3. The Admiral Theatre, a single screen, indoor motion picture theatre which is located at Fortieth and Farnam Streets in Omaha, was built and opened by Ralph Blank in approximately 1940. It is situated in a residential and light commercial area, approximately one and one-half miles from the central business district of downtown Omaha. During the relevant time period, the Admiral was a first-run motion picture theatre and had a seating capacity ranging from 866 to approximately 966.

4. The Chief Theatre was built and opened by Ralph Blank during 1945. Located on South 24th Street, between K and L Streets, a commercial area approximately three miles from the center of downtown Omaha, it too was a single screen, first-run indoor motion picture theatre. The Chief had a seating capacity in excess of 1200 during the relevant period. Between December 20, 1971 and July 15, 1972, the Chief was closed for repairs following a disturbance during a movie in which the theatre was damaged. The Chief was closed permanently on December 10, 1972 due to substantial operating losses. In commenting upon the closing of the Chief Theatre, Robert Blank, in a published letter to a trade journal, noted the demise of the packinghouses in South Omaha and observed that " 'business just isn't there.' "

5. Opened by Ralph Blank in 1954, the Skyview is a single screen outdoor drive-in theatre, which is located at 72nd and Hartman Streets in Omaha. The drive-in, which is situated in a light commercial and residential neighborhood with some industrial development to the north and a public golf

course immediately adjacent to the south, has a capacity of approximately 1200 automobiles.

6. Exhibitor-defendants, competitors of the plaintiff exhibitors, owned, operated, or managed first-run movie theatres in the Omaha-Council Bluffs market area during the period between March 15, 1970 and March 15, 1974. These defendants include: The Douglas Theatre Company, a Nebraska corporation, and Russell Brehm, a Nebraska resident and an officer of The Douglas Theatre Company; the Cooper Theatres, Inc., a Nebraska corporation, and Elwood Thompson and Herman Hallberg, Nebraska residents and officers of Cooper Theatres; the American Multi-Cinema, Inc. (AMC), a Missouri corporation, and Stanley Durwood, a Missouri resident and an officer of AMC; J.S.B. Amusement Corporation of Nebraska, a Nebraska corporation, and Sarge Dubinsky and Irwin Dubinsky, Nebraska residents and officers of J.S.B.; the Mann Theatres Corporation of California, a California corporation, and Theodore Mann, a California resident and an officer of Mann Theatres; and Northwest Cinema Theatre, a Delaware corporation, and Melvin Lebewitz, a Minnesota resident and an officer of Northwest Cinema.

7. The evidence indicates that the theatres operated during the relevant time period in the Omaha-Council Bluffs market area by defendants Cooper Theatres, AMC, J.S.B., Mann Theatres, and Northwest Cinema were part of a chain or circuit of movie theatres operating outside of the market area.

8. As shown in the following table, exhibitor-defendants, at some time during the relevant period, operated 15 theatres in the Omaha-Council Bluffs area. Of these 15 theatres, five are multiscreen theatres, bringing the total number of screens operated by the exhibitor-defendants to 28. However, because of the opening, closing, and selling of several of these theatres, the 28 screens were never being operated by the defendants at one time during the relevant time period.

9. The exhibitor-defendants operated these following theatres in the market area during the relevant time period:

| OWNER & THEATRE | TYPE | TOTAL NO. OF SCREENS | SEATING OR CAR (C) CAPACITY | DATES OF OPERATING BY DEFENDANTS DURING RELEVANT TIME PERIOD |
|---|---|---|---|---|
| Douglas: | | | | |
| Capri<br>Carter Lake, Iowa | Drive-In | 1 | 750C | 3/15/70 - 9/20/72 |
| Cinema II<br>2828 So. 82nd Av.<br>Omaha, Nebraska | Indoor | 1 | 550 | 3/15/70 - 3/15/74 |
| Cinema Center<br>2828 So. 82nd Av. | Indoor | 1 | 812 | 3/15/70 - 3/15/74 |
| 84th & Center<br>Omaha, Nebraska | Drive-In | 1 | 820C | 3/15/70 - 3/15/74 |
| Q-Twin<br>3433 No. 90th St.<br>Omaha, Nebraska | Drive-In | 2 | 700C | 3/15/70 - 3/15/74 |
| Maplewood Twin<br>3433 No. 90th St.<br>Omaha, Nebraska | Indoor | 2 | No.1: 350<br>No.2: 350 | 10/31/73 - 3/15/74 |
| Q-Cinema 4<br>5909 South 120th<br>Omaha, Nebraska | Indoor | 4 | No.1: 400<br>No.2: 300<br>No.3: 300<br>No.4: 400 | 6/28/72 - 3/15/74 |

| OWNER & THEATRE | TYPE | TOTAL NO. OF SCREENS | SEATING OR CAR (C) CAPACITY | DATES OF OPERATING BY DEFENDANTS DUR- ING RELEVANT TIME PERIOD |
|---|---|---|---|---|
| **Cooper:** | | | | |
| Cooper 70 1410 Douglas Omaha, Nebraska | Indoor | 1 | 687 | 3/15/70 - 3/15/74 |
| Dundee 4952 Dodge Omaha, Nebraska | Indoor | 1 | 475 | 3/15/70 - 3/12/74 |
| Indian Hills 8601 W.Dodge Rd. Omaha, Nebraska | Indoor | 1 | 804 | 3/15/70 - 3/15/74 |
| **AMC:** | | | | |
| Six-West 245 Boston Mall Westroads Shopping Ctr. Omaha, Nebraska | Indoor | 6 | No.1: 290 No.2: 319 No.3: 280 No.4: 259 No.5: 259 No.6: 210 | 3/15/70 - 3/15/74 |
| **J.S.B.:** | | | | |
| Astro Theatre 2001 Farnam Omaha, Nebraska | Indoor | 1 | 1454 | 12/13/72 - 3/15/74 |
| **Mann:** | | | | |
| Fox Westroads 264 Boston Mall Westroads Shopping Ctr. Omaha, Nebraska | Indoor | 1 | 756 | 6/30/73 - 3/15/74 |
| Strand 6th & Broadway Council Bluffs,Iowa | Indoor | 1 | (?) | 6/30-73 - 1/1/74 |
| **Northwest:** | | | | |
| Park 4 8558 Park Drive Ralston, Nebraska | Indoor | 4 | No.1: 291 No.2: 238 No.3: 238 No.4: 296 | 7/7/72 - 3/15/74 |

10. In addition to those theatres owned by the exhibitor-defendants at some time during the period between March 15, 1970 and March 15, 1974, other theatres were operating in the Omaha-Council Bluffs market area. These additional theatres included the Council Bluffs, Golden Spike, and the 76th and West Dodge drive-in theatres, and the Beacon, Bellevue, Center, Crest, Military, Muse, Omaha, Orpheum, Papio, Pussycat and Cinema 16 indoor movie theatres. Together with the predominantly sub-run Strand Theatre in Council Bluffs, these theatres, with the exception of the Orpheum Theatre, were not significant factors in the distribution of quality first-run film in the Omaha-Council Bluffs market during the relevant time period.

11. The distributor-defendants conduct national operations and, at all times relevant to this lawsuit, were in the business of distributing copyrighted first-run motion picture films to exhibitors in the Omaha-Council Bluffs market area. The distribu-

tor-defendants include seven different corporations: Allied Artists Pictures Corporation, a Delaware corporation with its principal place of business in New York, New York; Avco Embassy Pictures Corporation, a New York corporation with its principal place of business in New York, New York; Columbia Pictures Industries, Inc., a Delaware corporation with its principal place of business in New York, New York; Paramount Pictures, a Delaware corporation with its principal place of business in New York, New York; Twentieth Century-Fox Film Corporation, a Delaware corporation with its principal place of business in Beverly Hills, California; Universal Film Exchanges, Inc., a Delaware corporation with its principal place of business in New York, New York; and Warner Bros. Distributing Co., a New York corporation with its principal place of business in Burbank, California.

12. Not all film distributors distributing first-run motion pictures in the Omaha-Council Bluffs market area during the relevant period are defendants in this lawsuit. Non-defendant distributors include United Artists, American International Pictures, Buena Vista (Walt Disney productions), MGM, and other smaller independent motion picture distributors.

13. In distributing motion pictures to exhibitors, distributors do not sell them. Rather, the rights to exhibit motion pictures are acquired by exhibitors under license agreements from the distributors covering specified and limited terms of exhibition in return for which the exhibitors pay license fees or "film rental." The objective of the distributor is to obtain the greatest percentage of film rental it can from the first exhibition of a picture, as first-run gross receipts are the highest.

14. While the method for licensing pictures is the independent and individual choice of the distributor, distributor-defendants licensed first-run pictures in Omaha on a system of competitive bidding and negotiation. Under this system bid invitations were sent at the same time to Omaha exhibitors from the branch office of the distributors—Avco Embassy (Minneapolis), Allied Artists (Kansas City), Columbia (Des Moines), Paramount (Des Moines), Twenti-

eth Century-Fox (Des Moines), Universal (Des Moines), and Warner Bros. (Des Moines). These bid invitations set forth the availability date of the picture, and oftentimes also contained minimum terms as to film rental (as a percentage of the gross receipts), opening dates, minimum play time, holdover terms, sharing of advertising expenses, and film rental guarantees or advances. Sometimes the invitations also indicated whether the picture was being offered for exclusive or multiple (day and date) exhibitions, or whether the exhibitor could submit offers for either exclusive or multiple runs, or both. Bid invitations further specified date and time within which bids had to be received by the distributor's branch office in order to receive consideration. .

15. Exhibitors responded to bid invitations by submitting written offers of terms or by written or oral notification that they were not submitting a bid but would be willing to negotiate if no bids were accepted. All such bids received were opened on the date due and forwarded by the branch manager to the regional or home office for evaluation. Frequently, the branch managers would also forward a recommendation.

16. A final decision on the bids was made at the regional or home office and the branch manager received instructions either to notify the exhibitors that the picture had been awarded on bid or that all bids had been rejected. Bid invitation letters or forms reserved to the distributor the right to reject all bids and license the picture by direct negotiation.

17. If all bids were rejected, the branch managers were instructed either to rebid the picture or to enter into negotiations to secure the best licensing agreement possible. When the picture was to be negotiated, the branch managers notified exhibitors of their intent to negotiate the license of a picture. Some distributors notified only exhibitors who responded in writing to the bid invitation; others notified all exhibitors to whom bid invitations were sent. In the former situation, where only one bid was submitted, the negotiation might be "non-competitive"; whereas in the latter situa-

tion, the negotiation would be "competitive."

18. Negotiations were generally conducted orally over the telephone, but frequently the terms were confirmed in writing by the exhibitor by letter or telegram. Offers received on negotiations were also subject to approval by the regional or home office.

19. Final acceptance of an offer by either bid or negotiation was followed by a written license agreement. Although advertising terms were included in these agreements, separate advertising agreements, for determining the distributors' contribution to the expense for advertising the picture, were often entered into. The licensing agreement between the distributor and exhibitor did clearly specify the theatre and screen at which the picture would be shown, the opening date, the length of the engagement, the terms, if any, on which the exhibitor would hold over the picture after the initial term, whether the exhibitor had a right to an exclusive exhibition or whether it would play the picture simultaneously (day and date) with other theatres, the time, if any, which had to elapse after the end of the run before the picture would be available for a subsequent run ("clearance"), and most importantly, the method by which film rental would be computed and paid.

20. In most cases, film rental was determined by a percentage of the gross box office receipts. The method of dividing these receipts varied. One common formula, however, was to total gross receipts each week, deduct from that an agreed upon "house allowance" and divide the balance 90% to the distributor and 10% to the exhibitor. These contracts, which are generally called "90/10" contracts, also included percentage "floors" that usually decreased over the term of the contract. The floors set minimum percentages on weekly box office receipts which would be allocated to the distributor as film rental. Thus, a computation would be made by both the 90/10 method (after deducting the house allowance) and by the percentage "floor" (without regard to any house allowance deduction), and the distributor would receive the

greater amount produced by either of these methods.

Another method of paying film rental was by contracts specifying a straight percentage division of gross receipts, which generally decreased each week over the run of a film. Still other contracts specified for the particular theatre a percentage division based on a "sliding scale," a table setting forth percentage divisions of gross receipts as film rental for corresponding ranges of grosses. A few contracts simply specified a flat dollar amount for film rental.

21. In some instances, the distributors requested in their bid invitations that exhibitors include a guarantee of film rental in a specified sum. A guarantee would be paid by the exhibitor regardless of whether or not the picture generated that amount in film rental under the contract terms. Guarantees were generally required to be paid in advance to exhibition, but are to be distinguished from "advances," which were specified amounts that some bid invitations also requested of exhibitors prior to exhibition of a film. Unlike the guarantee, the advance was merely applied against the film rental actually earned under the contract terms, and any portion of the advance not so applied was refundable to the exhibitor.

22. In the licensing of films to exhibitors, the distributors could control the terms of the final agreement and settlement. Not stating any dates by which award decision would be made, bid invitation letters or forms specifically reserved to the distributor the right to reject all bids, even bids that met the minimum suggested terms. The licensing agreement forms utilized by the distributors during the relevant time period to contract the exhibition of films in the Omaha-Council Bluffs market also contained certain penalty clauses or liquidated damage provisions that could be exercised by a distributor should an exhibitor fail to show the film for the period specified by the licensing agreement. On occasion, after the film had been licensed by competitive bidding or negotiation, distributors would request adjustment of contract terms from exhibitors or would grant such adjustments to exhibitors. The practice

and frequency of granting adjustments varied among distributors, but were sometimes granted where gross receipts for a particular picture were unexpectedly low or where other circumstances involving the showing of a film by an individual exhibitor warranted such treatment.

23. The term "moveover" refers to the practice of taking a picture off the screen indicated in the licensing agreement and moving it to another screen or theatre for exhibition. During the relevant time period, some distributors permitted exhibitors to move over films in market area theatres as a continuation of the first run, a practice which permitted exhibitors to compensate for bidding errors of over- or underestimating patronage of a film by placing it in a correspondingly smaller or larger auditorium or theatre. Distributor-defendants Paramount, Universal, and Warner Bros. had company policies prohibiting moveovers by exhibitors.

24. In evaluating exhibitor offers, the distributor had to make a judgment as to which theatre offered the greatest revenue producing possibility. The distributors had to weigh not only the contract terms offered by an exhibitor, but also the "grossing potential" of the theatre offered; that is, the demonstrated ability of the theatre to attract patrons, which is largely a matter of physical quality and location.

25. Though playing some subrun motion pictures, plaintiffs and exhibitor-defendants were primarily interested in licensing first-run film. Quality first-run films were in short supply in the Omaha-Council Bluffs market area during the period from March 15, 1970 to March 15, 1974. Furthermore, the construction in the late 1960's and early 1970's of several theatres (including several with multiple screens) in the western sections of Omaha, to where there was a gradual population movement, substantially increased the number of screens competing for available first-run pictures. While all theatres experienced difficulty in obtaining product, this was particularly true of theatres in downtown Omaha. By the summer of 1974, the Astro, which was owned and operated by exhibitor-defendant J.S.B., and the plaintiff Admiral Theatre were the only viable first-run downtown theatres. Exhibitor-defendant Cooper Theatres had sold the Dundee in March of 1974 and closed the Cooper 70 in June of that year. Exhibitor ABC Midwest had also closed the Orpheum.

26. In response to the shortage of quality first-run film, which had created a sellers' market highly favorable to the distributors, a group of exhibitors entered into a split of product arrangement. The exhibitors under this arrangement split available first-run motion pictures from all the distributors, and they agreed not to bid or negotiate for a film split to another exhibitor, without that exhibitor's consent, in the hope of lowering the film rentals paid to distributors. Usually a film was split to only one exhibitor under this arrangement, though it was sometimes agreed that two split members could play the same film on a day and date basis. In a few instances, though a film had been split to only one exhibitor and despite their apparent arrangement not to bid against one another, more than one member of the split would submit a bid.

27. During the relevant time period there were two separate splitting arrangements: the first split operated during the period between March 15, 1970 and February 29, 1972, and the second split operated during the period between November 29, 1972 and March 15, 1974. There was no split of first-run films in the Omaha-Council Bluffs market area between February 29, 1972 and November 29, 1972. Hence, the two splitting arrangements, each of which was subject to changing membership, operated for a total of approximately thirty-nine months out of the forty-eight month period in question.

28. The members of the first exhibitor split included nondefendants ABC Midwest and National General and defendants AMC, Cooper Theatres, and J.S.B. Exhibitor-defendants J.S.B., however, did not enter the split until April 15, 1971. During the period from March 15, 1970 to February 29, 1972, these exhibitors would hold split meetings in which split members on a predetermined rotating basis would select films from a list of forthcoming motion pictures. After each participant had made his selection, he was

free to attempt to license the selected films from the distributors through bidding or negotiation. A split member was under no obligation to bid or negotiate on those films he selected, nor did the fact that a film had been split to him mean that he would be able to license it from the distributor.

29. This first splitting arrangement came to an end when distributor-defendant AMC indicated that it would no longer participate. The other exhibitor members then determined that there were too many non-member exhibitors in Omaha to make the arrangement effective. In explaining its withdrawal from the split, AMC's representative noted that exhibitor-defendant Douglas Theatres, which had withdrawn from the split prior to the relevant time period, had been securing too many films over split members.

30. After a nine-month period in which there was no exhibitor split in Omaha, a second splitting arrangement was organized. Initially, members of the new split included nondefendant National General and defendants AMC, Cooper Theatres, J.S.B., Douglas Theatres, and Northwest Cinema. On June 30, 1973, exhibitor-defendant Mann Theatres bought out National General in Omaha and apparently thereafter replaced National in the split. Although the membership and the rotation for selecting films changed, the basic purpose and workings of the second split were identical to those of the earlier split.

31. Prior to split meetings during the relevant period of time, a split member would attempt to secure from the distributors and other sources information regarding the release date, stars and MPAA rating of upcoming first-run motion pictures, and would prepare a list of available films from such information. On a few occasions, split members during their meeting would place phone calls to distributors' home offices to gain additional information. The distributors who provided such information were generally aware of the Omaha split. Results of the split meeting were sometimes communicated to a distributor by the exhibitor to whom that particular distributor's picture had been split.

32. With the exception of defendant Allied Artists, distributor-defendants knew of the Omaha split, though the extent and the time when such knowledge was acquired remains unclear. Defendants Paramount, Universal, and Warner Bros. do not deny knowledge of the split, but there is direct testimony and evidence that these distributor-defendants refused to either recognize or always abide by the results of the split.

33. Some distributor-defendants, knowing the results of the split, did on occasion contact the exhibitor to whom the film had been split and solicited his bid. On at least two occasions reflected in the record, a distributor-defendant likewise personally contacted plaintiffs to secure offers for first-run films.

34. For the purpose of suggesting that distributor-defendants had given exhibitor split members irregular and preferential treatment, Robert Blank, on the basis of documents produced by the defendants and subject to varying interpretations, offered his conclusions regarding a number of the licensing transactions involving first-run motion pictures during the period in the Omaha-Council Bluffs market area. Specifically, this testimony with respect to these transactions of particular films, transactions in which plaintiffs were not often involved, allegedly showed that split members were permitted by the distributor-defendants to engage in moveovers, shorten runs without penalties, have late bids accepted or considered, receive adjustments on terms competitively bid or negotiated after the due date, license films prior to the due date, and cancel films once licensed. This testimony, the introduction of which took several trial days, is not set forth here as to each of the transactions on a specific film in which preferential treatment purportedly occurred (e. g., run shortened on *Promise At Dawn*). The following table, however, attempts to summarize the testimony and exhibits introduced and total the number of instances in which such treatment allegedly occurred with respect to the bidding on specific films during the relevant time period. (Because testimony of more than one type of treatment as to a

particular film was sometimes introduced, the horizontal tallies with respect to instances of irregular and preferential treatment may be greater than the number of film transactions introduced as to any one distributor-defendant.) (See table, page 1281.) Blank's expertise in interpreting defendants' documents was seriously challenged. Strong contrary evidence was also introduced: in some instances the mere occurrence of preferential treatment was challenged; and in most instances, reasons said to justify such treatment were offered.

35. Plaintiffs, though having knowledge of and not resisting their operation, did not participate in the splitting arrangements at any time during the period. There is conflicting evidence as to whether plaintiffs were asked to join the split. An AMC representative indicated that he had unsuccessfully asked Ralph Blank to join. But exhibitor-defendant Sarge Dubinsky testified plaintiffs were not asked to join, both because they were traditional "loners" and because, having sufficient first-run film, they did not ask to join.

| DISTRIBUTOR-DEFENDANT | NUMBER OF FILM TRANSACTIONS IN EVIDENCE | FILM MOVEOVERS | FILM RUNS SHORTENED W/OUT PENALTIES | FILM BIDS ACCEPTED OR ALTERED AFTER DUE DATE | FILM AVAILABILITY DATE MOVED UP | FILM LICENSED PRIOR TO BID DUE DATE | FILM CONTRACT CANCELLED |
|---|---|---|---|---|---|---|---|
| Allied Artists | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Avco Embassy | 5 | 3 | 2 | 1 | 0 | 0 | 0 |
| Columbia | 7 | 0 | 3 | 5 | 1 | 0 | 0 |
| Paramount | 15 | 0 | 3 | 9 | 0 | 1 | 2 |
| Twentieth Century-Fox | 6 | 1 | 0 | 4 | 0 | 1 | 0 |
| Universal | 4 | 0 | 1 | 1 | 0 | 0 | 1 |
| Warner Bros. | 9 | 1 | 0 | 4 | 1 | 1 | 0 |
| TOTAL | 46 | 5 | 9 | 24 | 2 | 3 | 3 |

36. During the 1960's and until the latter part of 1970, Ralph Blank had an agreement with United Artists, a major distributor of motion pictures, to play United Artists pictures first-run in plaintiffs' three theatres (day and date among the three). United Artists did not license pictures in Omaha on a competitive bidding system and Ralph Blank was United Artists' outlet for first-run pictures in Omaha until the summer of 1970. (Sometime thereafter, defendant J.S.B. and the Astro Theatre became the United Artists outlet.) Prior to January of 1971, Avco Embassy also did not license by competitive bidding, and plaintiffs during the preceding year had been their exclusive first-run customers in Omaha. Furthermore, during 1970 and 1971, plaintiffs had an arrangement with AIP (American International Pictures) to play their product. This arrangement terminat-

ed when plaintiffs refused to pay increased rental rates.

37. Plaintiffs, through the uncorroborated testimony of Robert Blank, assert that the Admiral, Chief and Skyview Drive-In theatres were only successful in licensing the lower quality first-run films during the period between March 15, 1970 and March 15, 1974. The Admiral Theatre did license and play "Fiddler on the Roof" (March 15, 1972 through February 27, 1973), "Man From LaMancha" (March 28, 1973 through May 1, 1973), and "Last Tango in Paris" (June 20, 1973 through September 11, 1973). While further testimony showed the Skyview Drive-In to be capable of large grosses, the drive-in theatre business is generally seasonal in nature and is particularly keyed to exploitation films.

38. Whenever first-run film was being released in the Omaha-Council Bluffs mar-

ket area, distributor-defendants sent bid notices to plaintiffs. Plaintiffs also received screening notices, though the Blanks, as other exhibitors in the area, had to travel to Lincoln, Nebraska or Des Moines, Iowa to attend such screenings. Exhibitor-defendants Douglas Theatres, Cooper Theatres, and J.S.B., which controlled a majority of the first-run screens in Omaha, had their offices in Lincoln.

39. There is no evidence that plaintiffs attempted to and were not permitted to engage in moveovers, shorten runs without penalties, submit late bids, receive adjustments on pictures licensed by competitive bid or negotiation, or have availability dates moved up.

40. Based upon exhibits introduced into evidence, conflicting and inconclusive testimony was offered regarding plaintiffs' claim that on many occasions throughout the period distributor-defendants rejected their bids or offers in favor of lesser bids or offers from exhibitor-defendants. Plaintiffs, with respect to four films in particular ("The Conversation," "The Exorcist," "Cromwell," and "Camelot"), offered extensive evidence in an attempt to show that their bids or offers were clearly superior and yet still rejected. Furthermore, though unsubstantiated, Robert Blank testified that while plaintiffs responded with over a hundred "no bid, will negotiate" communications during the relevant period, they were seldom contacted by the distributor-defendants to negotiate.

41. During the relevant time period, plaintiffs and officials of Twentieth Century-Fox at one time quarreled over the amount of film rental that was owing on pictures that had played at plaintiffs' theatres. A lawsuit resolved the dispute in favor of the plaintiffs.

42. Plaintiffs, throughout the period in question, submitted formal *written* bids on 12 pictures, submitting their first such bid during the relevant period for the "New Centurions" in July of 1972.

| Distributor-Defendant | Picture | Accepted |
|---|---|---|
| Allied Artists | None | |
| Avco Embassy | None | |
| Columbia | New Centurions | No |
| Paramount | Bang The Drum Slowly | Yes |
| Fox | Butch Cassidy | No |
| Universal | None | |
| Warner Bros. | Camelot | No |
| | Jeremiah Johnson | No |
| | Deliverance | No |
| | Cancel My Reservation | No |
| | Exorcist | No |
| | Magnum Force | No |
| | Deadly Trackers | Yes |
| | Mame | No |
| | McQ | Yes |

43. The evidence and plaintiffs pretrial contentions show that plaintiffs, during the period between March 15, 1970 and March 15, 1974, made some type of offer of specific terms for the following first-run pictures and with the results indicated.

| Distributor-Defendant | Picture | Accepted |
|---|---|---|
| Avco | Ski Bum | Yes |
| | People Next Door | Yes |
| | CC & Company | Yes |
| | Nice Girl | Yes |
| | Swimming Pool | Yes |
| | Rider on the Rain | Yes |
| | Soldier Blue | Yes |

| Distributor-Defendant | Picture | Accepted |
|---|---|---|
| Avco | Sporting Club | No |
| | Macho Callahan | Yes |
| | Jory | Yes |
| | Hercules Combination | Yes |
| | All the Way Boys | Yes |
| | Thumb Tripping | Yes |
| | Promise At Dawn | No |
| | Zulu | No |
| | House Is Not A Home | No |
| | Day of the Dolphin | No |

17 offers, 12 accepted, success rate 71%

| | | |
|---|---|---|
| Columbia | New Centurions | No |
| | Cromwell | No |
| | 10 Rillington Place | No |
| | Last Rebel | No |
| | Owl & Pussycat | Yes |
| | Never Sang For My Father | Yes |
| | Lady in The Car | Yes |
| | Pursuit of Happiness | Yes |
| | Man Called Sledge | Yes |
| | Brother John | Yes |
| | Brotherhood of Satan/ Fragment of Fear | Yes |
| | Horsemen | Yes |
| | Creatures The World Forgot | Yes |

13 offers, 9 accepted, success rate 69%

| | | |
|---|---|---|
| Paramount | Bang The Drum Slowly | Yes |
| | Conversation | No |
| | Unman Wittering Zigo | No |
| | Red Tent | No |

4 offers, 1 accepted, sucess rate 25%

| | | |
|---|---|---|
| Twentieth Century-Fox | Vanishing Point | Yes |
| | Celebration At Big Sur | Yes |
| | Escape From Planet of the Apes | Yes |

3 offers, 3 accepted, success rate 100%

| | | |
|---|---|---|
| Universal | Company of Killers | Yes |
| | Guns of A Stranger | Yes |
| | Sugarland Express | No |

3 offers, 2 accepted, success rate 67%

| | | |
|---|---|---|
| Warner Bros. | Jeremiah Johnson | No |
| | Deliverance | No |
| | Cancel My Reservation | No |
| | Exorcist | No |
| | Magnum Force | No |
| | Deadly Trackers | Yes |
| | McQ | Yes |
| | Mame | No |
| | Camelot | No |

| Distributor-Defendant | Picture | Accepted |
|---|---|---|
| Warner Bros. | Enter the Dragon | Yes |
| | Sacred Knives of Vengeance | Yes |
| | Badlands | No |

12 offers, 4 accepted, success rate 33%

In sum, plaintiffs' testimony indicated that their theatres made specific offers on 52 pictures released during the period by all distributor-defendants and were licensed 31, or approximately 60% of these. There may be some slight discrepancies in the tabulations, but plaintiffs did not deny that their success rate was near 60%.

44. Of those first-run films upon which they assertedly submitted offers of specific terms that were rejected, plaintiffs, through the testimony of Robert Blank, have presented evidence of irregular conduct which may have affected consideration of their offer on five of those films—"The Red Tent," "The Last Rebel," "The Exorcist," "Camelot," and "Butch Cassidy."

45. With respect to those first-run films upon which plaintiffs introduced evidence of specific offers of terms, the evidence further showed that nineteen of those films had been split by exhibitor-defendants. The results of these confrontations are summarized in the following table.

| Exhibitor Split to: | Film | Distributor | Licensed to: |
|---|---|---|---|
| Cooper | Red Tent | Paramount | Cooper |
| | New Centurions | Columbia | Douglas |
| | Drive He Said | Columbia | Cooper |
| | Mame | Warner Bros. | Cooper |
| | Soldier Blue | Avco | Plaintiffs |
| | Sporting Club | Avco | Plaintiffs |
| Mann | Exorcist | Warner Bros. | Mann |
| Douglas | Magnum | Warner Bros. | Douglas |
| | McQ | Warner Bros. | Plaintiffs |
| | Bang the Drum Slowly | Paramount | Plaintiffs |
| | Conversation | Paramount | Douglas |
| | Sugarland Express | Universal | Douglas |
| AMC | Hercules Combination | Avco | Plaintiffs |
| | Day of the Dolphin | Avco | AMC |
| | Escape from Planet of the Apes | Twentieth Century-Fox | Plaintiffs |
| | Deadly Trackers | Warner Bros. | Plaintiffs |
| | Owl & The Pussycat | Columbia | Plaintiffs |
| | Paul & Michelle | Paramount | Plaintiffs & AMC |
| JSB | Trinity Is Still My Name | Avco | Northwest |

Thus, of the nineteen pictures allocated by the split, nine were licensed to plaintiffs (including one day and date with the split member), nine were licensed to the split members to whom they were allocated (including one which played day and date with plaintiffs), and two were licensed to a split member other than the one to whom it was allocated.

46. Plaintiffs' expert, Dr. Felton, testified that the defendants' activities during the period from March 15, 1970 to March 15, 1974 caused damages of $151,085 to the Admiral Theatre. This figure was derived by a "comparable theatre" theory of damages, with the theatre comparable to the Admiral being a hypothetical theatre constructed by averaging the Astro and Dundee theatres.

47. No damage evidence was admitted with respect to the Chief Theatre and the Skyview Drive-In Theatre.

III.

DIRECTED VERDICT STANDARDS

Plaintiffs find in the foregoing facts evidence that exhibitor-defendants, by the split of product agreements, engaged in a conspiracy, the object of which was to de-

prive plaintiff theatres of quality first-run films and the result of which was substantial damages to the Admiral, Chief, and Skyview theatres. Distributor-defendants, plaintiffs further infer and find from these facts, knew of and joined in the implementation of that conspiracy by engaging in such practices as providing the split with advance release information not available to plaintiffs, rejecting plaintiffs' bids for inferior split member bids, and affording split members irregular and preferential treatment in the bidding and licensing of first-run films in the Omaha-Council Bluffs market area. Defendants, however, dispute plaintiffs' reading of the facts. In moving for directed verdicts, defendants submit to the Court that this evidence regarding the split and the alleged "irregularities" in the bidding and licensing of films is even legally insufficient pursuant to Section 1 of the Sherman Act to warrant submission of the case to the jury.

■ To establish their claims pursuant to Section 1 of the Sherman Act, plaintiffs, by a preponderance of the evidence, must prove three essential elements:

(1) That there was an agreement, conspiracy, or combination among the defendants in restraint of trade;

(2) That as a direct and proximate result thereof plaintiffs have been injured in their business and property; and

(3) That the damages which the plaintiffs sustained are capable of reasonable ascertainment and are not speculative or conjectural.

See *Zenith Radio Corp. v. Hazeltime Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). Both distributor-defendants and exhibitor-defendants contend that plaintiffs' evidence is incompetent and insufficient as a matter of law to establish any of the preceding three elements. Such a contention, however, has to be measured not only against the antitrust laws, but must also be considered in the context of case law pertaining to directed verdicts.

■ In the Eighth Circuit, the standard to be applied in considering a motion for directed verdict is essentially the same as the standard for entering judgment notwithstanding the verdict; the question is whether there is sufficient evidence to support a jury verdict against the non-moving party. *Schneider v. Chrysler Motors Corp.,* 401 F.2d 549, 554 (8th Cir. 1968).

> In passing upon the defendants' motion for a directed verdict the district court [is] required to view the evidence in the light most favorable to the plaintiff, to give the plaintiff the benefit of all inferences in his favor reasonably to be drawn from the evidence, and to deny the motion unless the evidence was so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided factually. *Kennedy v. United States Construction Co.,* 545 F.2d 81, 82 (8th Cir. 1976).

While the burden upon the defendant distributors and exhibitors is considerable, this Court must nevertheless sustain the pending motions as a matter of law if, without weighing the credibility of the witnesses, it concludes that plaintiffs have offered no substantial evidence which would sustain a favorable jury verdict. *Banks v. Keohring Co.,* 538 F.2d 176 (8th Cir. 1970); *United States v. Strebler,* 313 F.2d 402 (8th Cir. 1963); *Paramount Film Distributing Corp. v. Applebaum,* 217 F.2d 101 (5th Cir. 1954).

### IV.

### PROOF OF ANTITRUST VIOLATIONS

■ As is often true in a case of this type, plaintiffs, particularly with respect to distributor-defendants, have indirectly attempted to prove their conspiracy allegations by inferences drawn from defendants' conduct, rather than by direct proof of conspiratorial activities, joint agreements, or group decisions. Because it is difficult to prove the existence of an illegal scheme, which is the gravamen of an action under Section 1 of the Sherman Act, the law clearly does permit plaintiffs to rely upon all inferences that may be reasonably drawn from the defendants' course of conduct in light of the surrounding circumstance. *American Tobacco Co. v. United States,* 328 U.S. 781, 809–10, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Plaintiffs, in present-

ing their evidence against the distributors, have relied heavily upon two related forms of inferential proof. First, they attempted to prove that distributors' actions were taken against their own self-interest, which absent a valid explanation is inconsistent with decisions independently made and indicative of joint action. *Bergjans Farm Dairy Co. v. Sanitary Milk Producers,* 241 F.Supp. 476 (E.D.Mo.1965), *aff'd,* 368 F.2d 679 (8th Cir. 1966). Secondly, plaintiffs tried to create a jury issue as to the existence of a conspiracy between and among all defendants by evidence showing that distributor-defendants followed similar exclusionary business practices—"conscious parallelism." *Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.,* 394 U.S 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969), *rev'g per curiam* 404 F.2d 1008 (4th Cir. 1968).

There are, nevertheless, limitations upon proving conspiracy indirectly by means of inferences drawn from the circumstances surrounding defendants' conduct. The facts of those circumstances cannot themselves be based upon inference.

> Before considering the nature of the circumstances relied upon it is well to have in mind the rule of law relative to the probative force of such evidence. Even in a conspiracy case, which is ordinarily not susceptible of proof by direct evidence, facts and circumstances to sustain a verdict must be such as legitimately tend to sustain an inference. Inferences must be based upon proven facts or fact of which judicial notice must be taken and one inference cannot be based upon another inference. To sustain a finding of fact the circumstances proven must lead to the conclusion with reasonable certainty and must be of such probative force as to create the basis for a legal inference and not mere suspicion. *Wesson v. United States,* 172 F.2d 931, 933 (8th Cir. 1949).

*See also Brown v. Maryland Casualty Co.,* 55 F.2d 159 (8th Cir. 1932). Furthermore, the bare fact that defendant-distributors may have taken action against their apparent self-interest does not necessarily point to conspiratorial motivation.

The Sherman Act's prohibition of 'every contract, combination, or conspiracy' in restraint of trade does not forbid a supplier from independently deciding to refuse to do business with another, no matter how harmful that decision may be to the latter. Section 1 'does not prohibit independent business actions and decisions. A person still has the right to refuse to do business with another, provided he acts independently, and not pursuant to an unlawful understanding, tacit or expressed.' *Michelman v. Clark-Schwebel Fiberglass Corp.,* 534 F.2d 1036, 1042 (2d Cir. 1976).

*See also Dahl, Inc. v. Roy Cooper Co.,* 448 F.2d 17 (9th Cir. 1971). Even parallelism among the practices of distributor-defendants would not necessarily raise the inference of conspiracy where such practices were also expedient responses to business considerations. To reach the jury, plaintiffs must present sufficient evidence in addition to mere parallel conduct to warrant an inference that defendants have consciously and mutually reached an accord and are not merely individually reacting in a like fashion to business forces. *Viking Theatre Corp. v. Paramount Film Distributing Corp.,* 320 F.2d 285, 299 (3rd Cir. 1963).

> The crucial question is whether [defendants'] conduct toward [plaintiffs] stemmed from independent decision or from an agreement, tacit or express. To be sure, business behavior is admissible circumstantial evidence from which the fact finder may infer agreement. . . But this Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense. Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional attitude toward conspiracy; but "conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely.

*Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 540–541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954).

■ Therefore, while plaintiffs may rely upon inferences drawn from circumstantial

evidence in proving their charges of conspiracy, the facts and circumstances underlying those inferences "must attain the dignity of substantial evidence and not be such as merely to create a suspicion." *Johnson v. J. H. Yost Lumber Co.,* 117 F.2d 53, 61 (8th Cir. 1941). In the situation of a directed verdict motion, the situation presently confronting this Court, the Eighth Circuit has stated the following rule with regard to the utilization of circumstantial evidence and inferences in proving up a case.

> The old notion that a jury should not be allowed to draw any inference from circumstantial evidence, if the one is probable as the other, has fallen into discard and has been replaced by the more sensible rule that it is the province of the jury to resolve conflicting inferences from circumstantial evidence. Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture.

*Twin City Plaza, Inc. v. Central Surety & Ins. Corp.,* 409 F.2d 1195, 1202–03, n. 8 (8th Cir. 1969).

## V.

### CONSPIRACY IN RESTRAINT OF TRADE

■ Plaintiffs, presuming their ability to prove the presence of a "combination" or "conspiracy" under Section 1 of the Sherman Act, must further offer at least circumstantial evidence that defendant distributors and exhibitors *knowingly participated* in the split of product and alleged attendant sham bidding practices with the *intent* to deprive plaintiffs of their "fair share" of quality first-run film. *Flintkote Co. v. Lysfjord,* 9 Cir., 246 F.2d 368, *cert. denied,* 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). As to this membership in the alleged conspiracy, the evidence with respect to each individual defendant must be separately considered. The actions or statements of other defendants are of no consequence until the existence of a conspiracy is independently established and membership proven. *American Tobacco, supra; United States v. Scholle,* 553 F.2d 1109, 1117 (8th Cir. 1977); *United States v. Wixom,* 529 F.2d 217, 220 (8th Cir. 1976).

## A. DISTRIBUTOR–DEFENDANTS

■ Assuming that the exhibitor split of product, the existence of which is not in dispute, does constitute an illegal combination or conspiracy pursuant to Section 1 of the Sherman Act, the question as to distributor-defendants then becomes one of knowledge, intent, and participation. Plaintiffs' evidence of distributor-defendants' knowledge of the Omaha exhibitor split is not strong. The extent of and time when such knowledge was gained is uncertain, and, as plaintiffs' evidence reflected, direct proof of Allied Artists' knowledge is totally absent. Nevertheless, viewing the record in a light most favorable to plaintiffs, the evidence pertaining to knowledge, with the exception of Allied Artists, is sufficient to overcome directed verdict motions. Evidence as to the knowledge of Allied Artists and the intent of all distributor-defendants could conceivably be inferred from those activities allegedly evidencing participation. The law is clear that one is held to have intended the probable consequences of his acts. *William Goldman Theatres v. Loew's, Inc.,* 150 F.2d 738, 743 (3rd Cir. 1945), *cert. denied,* 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948).

Critical, therefore, to plaintiffs' case against the distributor-defendants is evidence of their participation in implementing or promoting the split of first-run film in the Omaha-Council Bluffs market area. Plaintiffs have offered four general types of evidence to prove the participation of distributor-defendants: (1) the provision of advance information to exhibitor split members; (2) the rejection of plaintiffs' bids and offers, even when superior to those of split members; (3) the irregular and preferential treatment accorded to split members in the form of moveovers, shortened runs, acceptance of late bids, adjustments of bids and film rental, advance licensing, and cancellation of licensed films; and (4) the acquiescence of distributor-defendants to the splitting of their product. Having previously reviewed this evidence, the Court proceeds

to determine the legal sufficiency of that evidence with regards to proof of distributor participation.

### 1. Advance Information

■ Plaintiffs have insisted throughout the trial of this lawsuit that distributor-defendants, during the period between March 15, 1970 and March 15, 1974, provided exhibitor-defendants with advance film information that was not unavailable to the Blanks. In surveying plaintiffs' evidence, the Court did note testimony indicating that defendants Avco Embassy, Columbia, and Universal did supply such information to the split members upon request. It is further apparent, though the source remains unknown, that the exhibitor-defendants had release information regarding the other distributor-defendants' films. Defendant Sarge Dubinsky further testified that phone calls were placed to "distributors" during split meetings so that additional information might be gained. Advance screening too was made available to split members in Lincoln, where defendants Douglas Theatres, Cooper Theatres, and J.S.B. had their corporate offices.

Even assuming that this advance information was unavailable to plaintiffs through the various trade journals, it is clear that plaintiffs neither requested nor were designedly refused the information that their competitors had acquired. Further conceding to plaintiffs that the provision of this information by three distributor-defendants raises an inference that all distributor-defendants so provided information, a thin inference at best, this similarity in behavior does not distinguish them from nondefendant distributors. Nondefendant AIP also provided information, and the information as to nondefendant films was sufficient to permit splitting of their product. That any distributor would provide information is not particularly surprising. Communication between exhibitors and distributors, by telephone or otherwise, is a part of the movie industry, and it is not at all inconsistent with their self-interest that distributors would want to provide information to drum up business and rentals for forthcoming films. Nor were the Lincoln screenings inconsistent with self-interest: distributors incurred costs to screen their films where those exhibitors owning the majority of Omaha screens could be found.

The Court is uncertain what plaintiffs view to be the upshot of this supposed favoritism. Arguably advance release information gave split members an advantage in more intelligibly entering into the bidding process. However more knowledgeable they may have been, the evidence does not indicate that their success in licensing first-run films was any better than that of the plaintiffs.

### 2. Plaintiffs' Bids

■ An examination of those first-run films upon which plaintiff theatres made a specific offer of terms belies their claim that distributor-defendants participated in the implementation or promotion of the Omaha split. As indicated in a preceding table, plaintiffs licensed approximately 60 percent of those films upon which they submitted offers of specific terms to distributor-defendants. Their least success was with Paramount and Warner Bros., where their success rate during the period was 25 percent and 33 percent, respectively. When it is recalled that there were nearly thirty screens in the Omaha-Council Bluffs market bidding for first-run film, even these percentages could not be considered excessively low.

Plaintiffs have countered, through the assertions of Robert Blank, that their theatres were notably unsuccessful in their bids for high grossing first-run motion pictures. With respect to those pictures, plaintiffs claim, their bids were ignored by defendant-distributors, even when equal or superior to those of the exhibitor-defendants. But, again as indicated in a preceding table, the evidence shows plaintiffs to have had no moderate success when bidding against the split. Of nineteen films upon which plaintiffs made specific offers of terms and which were allocated to the split, nine were licensed to the plaintiffs. There can be no reasonable inference from such figures that plaintiffs' specific term bids were ignored.

The record is long and involved as to plaintiffs' argument that their bids or offers on better quality film were unjustifiably rejected in favor of those from split members. The Court does not herein undertake the prodigious task of considering each of plaintiffs' claims. It does, however, briefly review in an exemplary fashion those four films upon which plaintiffs believe their suggested terms to have been unquestionably superior. Those films include "The Conversation," "The Exorcist," "Cromwell," and "Camelot."

The Court, notwithstanding its dutiful construction of the evidence in favor of the plaintiffs, has difficulty in determining the relevance of their claim of unjustified rejection with respect to "The Conversation." Blank's initial offer was rejected. But distributor-defendant Paramount then offered the film on a rebid, a transaction entirely separate from the first. During this rebid of the film, plaintiffs submitted neither a bid nor an offer.

Plaintiffs have argued at length that their bid on "The Exorcist," one of the three top grossing films of all time, was superior to that of defendant Mann Theatres, to whom the film was ultimately licensed. The decision to accept the bid of Mann Theatres for their Fox Westroads screen was made by Leo Greenfield, president of Warner Bros., with the concurrence of his district and regional managers. Greenfield testified that this decision was made upon his judgment that the Mann bid was "clearly superior to any other submitted." Mann's bid was seen as being superior to plaintiff Admiral's bid in that Mann bid the same $75,000 guarantee but with a fifteen as opposed to a twenty week minimum playing time. This was viewed as more desirable since in effect defendant Mann was guaranteeing that it could earn $75,000 for Warner Bros. in a month's less time than the plaintiff. Plaintiff, unlike Mann, did provide a "no pass" provision in its original offer, though the final contract executed by Mann Theatres also contained such a provision. Evidence also showed that the producers of the film forced Warner Bros. to move up the availability date to a time when if the Admiral's bid had been

accepted, plaintiff Admiral would have had to cancel another Warner Bros. picture ("McQ") which was booked for that time period. Furthermore, Greenfield believed the Fox Westroads' location was better than that of the Admiral.

The record reveals that plaintiffs submitted a negotiated offer for "Cromwell." It was, however, awarded on negotiation to the National General for the Fox Westroads Theatre. Again the evidence shows that plaintiffs could not have played "Cromwell" on the release date without having cancelled another picture belonging to that particular distributor. Plaintiff Admiral Theatre had been previously awarded on competitive negotiation "Owl and The Pussycat," a major first-run motion picture.

Defendant-distributor Warner Bros. rejected plaintiffs' bid in favor of Cooper Theatres' on "Camelot," a film which the evidence shows was not even split to Cooper. The picture was licensed for the Indian Hills, which Robert Blank concedes was perhaps the finest theatre in the Omaha-Council Bluffs area. With regard to this bid, as all the preceding bids, Blank's opinion that plaintiffs' bid was superior is premised largely on the fact that the Admiral's seating capacity was slightly larger than the theatre to which the picture was licensed. Besides ignoring such other important factors in grossing potential as location, an opinion based upon seating capacity assumes that the Admiral would have attracted more patrons than the smaller theatres where the pictures played. The record is void of any such evidence. In fact, the facts in evidence run counter to Blank's opinion. As previously indicated, six Omaha theatres with 700 or more seats were closed during the relevant time period. Among these theatres were two split members, including the Orpheum—the largest theatre in Omaha. Those theatres built since 1970 have generally been multi-screen theatres with the smaller individual auditoriums.

Plaintiffs' evidence as to first-run films upon which they offered specific terms, even their strongest evidence, fails to suggest distributor-defendants' participa-

tion in the implementation or promotion of the Omaha split. No proof of action contrary to self-interest has been offered. Even if, when construing the evidence in a light most favorable to plaintiffs, there should remain individual instances of discrimination, such proof would be legally unavailing in establishing a pattern of conspiratorial activity. This evidence would merely suggest that the distributor, in exercising its judgment as to which offer was better, had made a mistake. Courts, confronting the same directed verdict motions herein pending, have recognized that mistakes can be made in the competitive licensing of films, and that comparing bids in this context is made difficult because the variety of factors entering into a distributor's licensing decision are necessarily judged with a hindsight knowledge of a film's grossing potential. *Viking*, 320 F.2d at 296; *Brown v. Western Massachusetts Theatres, Inc.*, 288 F.2d 302, 304 (1st Cir. 1961). Hence, when there is no evidence that a distributor in choosing between offers did anything but exercise his own business judgment, the fact that the unsuccessful offer in retrospect may appear to have been better does not by itself indicate that the distributor acted improperly. *A.L.B. Theatre Corp. v. Loew's Inc.*, 355 F.2d 495, 501 (7th Cir. 1966).

### 3. Bidding Irregularities and Preferential Treatment

■ Plaintiffs introduced the evidence of alleged irregularities and preferential treatment in the licensing of first-run films for the purpose of inferentially arguing that distributor-defendants participated in a scheme to exclude plaintiffs from the market. These alleged irregularities and instances of preferential treatment were introduced solely through the opinion testimony of Robert Blank, whose conclusions were based upon his examination of documents produced during discovery by the defendants. When offered, this Court permitted such opinion testimony to come in under a ruling that it was being admitted both "temporarily" and "preliminarily." The Court recognized then and recognizes now that this particular testimony raises serious

foundational problems. In the first instance, the documents upon which Blank based his opinion had themselves been only "temporarily" admitted into evidence and were not without serious foundational infirmities. *See N.L.R.B. v. Sharples Chemical*, 209 F.2d 645 (6th Cir. 1954); *Standard Oil Co. v. Moore*, 251 F.2d 188 (9th Cir. 1957), *cert. denied*, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958); Fed.R.Evid. 803(6). Blank's opinion testimony, moreover, is based upon inferences drawn from his interpretation of the documents, and it is upon this testimony that distributor-defendants' participation in an illegal scheme is inferred. Such testimony is in clear disregard for the rule against pyramiding inferences, which has heretofore been discussed. *See Twin City Plaza, supra*. Finally, although claiming that the "irregular" conduct of distributor-defendants deviated from accepted practice or standards of the industry, plaintiffs have failed to offer any evidence other than Blank's opinion testimony as to the nature of those practices and standards.

The Court certainly does not believe that it would be error to strike that portion of Blank's testimony regarding the alleged moveovers, shortened runs, altered bids, advanced licensing, and cancelled contracts. However, such a ruling is unnecessary. The Court, as set forth in the preceding table, has fully considered this evidence in a light most favorable to plaintiffs (defendants' denial and defenses were ignored) and finds it completely lacking with respect to proving distributor-defendants' participation in the alleged conspiracy. Plaintiffs introduced evidence on only 46 of the some 400 first-run films released during the relevant period, and their proof of the purported irregularities and instances of preferential treatment, even when considered collectively as to all distributor-defendants, borders on the *de minimis*.

■ Supposing, for the sake of giving plaintiffs the full benefit of their argument, that there were a sufficient number of irregularities and instances of preferential treatment with which to be concerned, serious problems remain as to what these occurrences would in fact demonstrate.

Plaintiffs' evidence indicates that consideration of only five of their specific term offers for film could have been affected by such occurrences. Even then it must be remembered that competitive bidding and negotiation in the motion picture industry is not required by any rule of law. *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161–166, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). Distributors, as herein earlier noted, are in a position to control the licensing transactions and are free to impose or forego the penalty clauses of their own contracts. Hence, if parallel conduct could be shown as to shortened runs or moveovers between auditoriums of multi-screen theatres, a practice of which single-screen theatre owners as plaintiffs and several exhibitor-defendants are incapable, this without more would not point to conspiratorial conduct. *Brown, supra*, at 304. Such conduct would be entirely within the distributors' business interests. Moveovers, as shortened runs, are generally utilized by exhibitors to accommodate the revenue flow, and an exhibitor's business interests in these situations are usually not contrary to those of the distributor. Also, it should be recalled that alterations of bid or license terms, as the evidence has revealed, are often initiated at the distributor's request and are made for his benefit. The acceptance too of a late superior bid, as opposed to a timely inferior bid, certainly is not damaging to a distributor's economic betterment.

■ Plaintiffs claim that the common factor which inheres in distributor-defendants' conduct and points to conspiratorial participation is that plaintiff theatres have not been permitted the irregularities and preferential treatment afforded split members and cannot, therefore, submit high bids with the expectation that those bids might subsequently be altered if not fulfilled. Fatal, however, to plaintiffs' claim is the absence of demand. The law of this Circuit is clear that where charges of irregular or preferential treatment are made, there can be no conclusion drawn unless plaintiffs requested and were denied similar treatment.

'In order for plaintiffs to recover for defendants' denial of runs and clearances to them, plaintiffs must show that they requested defendants to grant them such runs and clearances.' *Vilastor Kent Theatre Corp. v. Brandt*, D.C.S.D.N.Y., 1955, 18 F.R.D. 199, 200. 'In the absence of such demand upon the part of [the] plaintiffs, the courts have consistently held there can be no recovery in an antitrust action.' *Lawlor v. National Screen Service Corp.*, 3 Cir., 1959, 270 F.2d 146, 154. *Columbia Pictures Corp. v. Charles Rubenstein, Inc.*, 289 F.2d 418, 421 (8th Cir. 1961). The rationale underlying this demand rule is made apparent in this case. Plaintiffs, for whatever reason, admittedly never requested the alleged irregular or preferential treatment given to other exhibitors; therefore, having never been denied that which other exhibitors practiced or received, plaintiffs cannot claim any pattern of discrimination against them. Without having asked and been denied, plaintiffs can make no claim that it was futile to request any type of adjustment in licensing terms. This particular evidence in the record, therefore, is not susceptible to an inference of conspiracy. *See Dahl, supra*, at 20.

*4. Acquiescence*

■ Referring to *United States v. Paramount Pictures*, 344 U.S. 131, 161, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), plaintiffs have argued that acquiescence in an illegal scheme is a form of participation and is as much a violation of the Sherman Act as the creation and promotion of the scheme. The record, however, does not indicate that there was either acquiescence or forbearance upon the part of distributor-defendants. Indeed, the evidence is otherwise. Once receiving, if they received, the results of split meetings, the distributors might deal with the exhibitor to whom their picture was split, but on the distributor's terms. If an agreement was not struck, the bids of other exhibitors were solicited. On two such occasions, the record indicates that plaintiffs' bid was personally solicited by officers of the distributor-defendants. Moreover, on several occasions bids of specific terms offered by the plaintiffs were accepted over split members' bids. This evidence supports neither an inference of acquiescence nor of futility in bidding. If

plaintiffs made a clear demand upon a film, either by a bid or offer of specific terms, the evidence consistently suggests that it was considered.

### 5. Absence of Proof

Plaintiffs have failed as a matter of law to introduce evidence that is sufficient to create a jury question as to all distributor-defendants. Looking at the evidence with respect to each distributor-defendant as a whole and giving it the benefit of all reasonable inferences, it simply cannot be said to show that these defendants were participating members of the alleged conspiracy. *Continental Co. v. Union Carbide*, 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1964).

Far from being circumstantial evidence of a conspiracy, the conduct of the distributors tabulated above would appear to be evidence to the contrary. Plaintiffs do not dispute that they were invited to bid and negotiate on first-run films. Their evidence regarding the distribution of advance information and the practice of sham bidding fails to uncover any pattern of similarity in conduct by the distributor-defendants that is sufficient to raise an inference of concerted action between or among any of those defendants. Neither has any circumstance present in the market during the period, such as other illegal action, nor conduct contrary to economic self-interest been offered to suggest that "conscious parallelism" might be present. *See Bordonaro Bros. Theatres v. Paramount Pictures*, 176 F.2d 594, 598 (2d Cir. 1949). There is no evidence that plaintiffs' offers were considered on anything other than their own merit, and there is not the slightest evidence of any mutual action or scheme on the part of distributor-defendants to exclude plaintiffs, who did enjoy measurable success in securing films throughout the period, from the market. Indeed, there has been no solid evidence presented to suggest why distributors would cooperate with a splitting arrangement, an arrangement designed to operate contrary to their apparent desire to obtain the largest film rentals possible. Only defendant Twentieth Century, which was in a financial dispute with Ralph Blank, had any apparent reason not

to deal with plaintiffs, and this can scarcely be considered evidence of a conspiracy. *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 635–36 (E.D.N.C.1960), *aff'd per curiam*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968).

There being, therefore, "no basis upon which to draw an inference that the actions taken and the decisions made by the defendants were motivated by anything other than independent business judgment," the Court finds it must direct a verdict for each of the distributor-defendants. *Viking, supra*, at 300. The supposed inferences suggesting that these defendants participated in a conspiracy in restraint of trade, the first essential element of proof pursuant to Section 1 of the Sherman Act, are so tenuous that any unfavorable jury verdict could only be rooted in improper speculation and conjecture.

### B. EXHIBITOR–DEFENDANTS

In contrast to distributor-defendants, proof of knowledge and participation as to the exhibitor-defendants is a relatively simple matter. Activity or membership in the exhibitor split at any time during the relevant four-year period is sufficient. Nevertheless, with respect to exhibitor-defendants Stanley Durwood, Elwood Thompson, and Theodore Mann, there has been no such evidence, and verdicts as to them must clearly be directed. As for the remaining exhibitor-defendants, and especially Mann Theatres, proof of participation is thin but sufficient for purposes of surviving a directed verdict. Having thus both shown the presence of a "combination" or "conspiracy" in the form of a split and sufficiently proven the defendants' knowledge of and participation in that split, the critical question becomes whether this particular combination or conspiracy was in "restraint of trade." A "conspiracy" pursuant to Section 1 of the Sherman Act, is not in itself a violation; it must be a conspiracy in restraint of trade.

The language of the Sherman Act, if read literally, makes illegal nearly every type of agreement between businessmen. Early in the Act's history, however,

the United States Supreme Court limited this language, holding under the "rule of reason" that only those agreements which "unreasonably" restrain trade are in violation of the law. *See Standard Oil Co. v. United States*, 221 U.S. 1, 31, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *Mackey v. National Football League*, 543 F.2d 606, 618 (8th Cir. 1976). Subsequently, as antitrust law developed, courts began to consider certain types of agreement as being so consistently unreasonable that they were deemed to be illegal *per se*.

> . . . [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. *Northern Pac. R. Co., supra*, 356 U.S. at 5, 78 S.Ct. at 518.

*See Mackey, supra.* Plaintiffs here argue that the Court should apply a *per se* rule to the exhibitor split agreement. Defendants disagree, arguing that the rule of reason applies. Having weighed these respective arguments, the Court has determined that the rule of reason should govern the legality of the split.

The Court, in invoking the rule of reason, would note that plaintiffs have offered no evidence from which price-fixing, a *per se* violation, might be inferred. Nor do the facts, as previously set forth, support plaintiffs' claims of bid rigging or group boycott, both of which are *per se* violations. Without distributor participation, bid rigging would be impossible. As for any claim of boycott, it is belied by the fact that the target of the split was the distributors and not the plaintiff-exhibitors, who never requested to participate in the split and were never denied admittance. *See generally Mackey, supra.* Clearly, if the *per se* rule were to apply, it would have to do so pursuant to plaintiffs' contention that the split constituted a horizontal market division, a division found illegal *per se* by the Supreme Court in *United States v. Topco Associates,*

405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

The Court does not agree that this particular motion picture split, by its purpose and effect, can be properly characterized as a market division arrangement pursuant to *Topco.* Confronted with a shortage of quality film and a seller's market, exhibitors formed the split, as all parties concede, to lower the amount of film rental paid to distributors; thus, its direct purpose was to cut the price of an incoming product and not to limit competition among exhibitors in the market area. The split attempted to guarantee that a member would not have to compete against other members for the licensing of a particular film, but it did not stop other members from competing for patrons by the simultaneous showing of other split first-run films. Furthermore, unlike the association in *Topco*, the split was not in control of the product that its members distributed, and once split there was no collective effort to impose restrictions upon its sale in the market. *See* Sullivan, *Law of Antitrust*, 381 (1977).

In any case, the Court finds that the law as expressed by the *Viking Theatre* court, and as affirmed by an equally divided Supreme Court, still controls.

> . . . [T]he failure to include all exhibitors in the split system will not render it illegal in the absence of evidence that it was so employed as to *unreasonably restrict* the competitive market, or had this result. . . . [W]e decline to hold the split system to be per se illegal, and we do not consider the system, standing alone, as evidence of a conspiracy to violate the antitrust laws. (Emphasis added.) *Viking*, 320 F.2d at 293, *aff'd per curiam*, 378 U.S. 123, 84 S.Ct. 1657, 12 L.Ed.2d 743 (1964).

*Accord, Dahl, supra; Seago, supra; Royster Drive-In Theatres Inc. v. American Broadcasting—Paramount Theatres, Inc.,* 268 F.2d 246 (2nd Cir. 1959). For two reasons, whatever the effect of the *Topco* case, the Court anticipates that the Supreme Court will retain *Viking* and the rule of reason as the law with respect to exhibitor splits in the motion picture industry. First, consid-

erations of *stare decisis* are given particularly strong weight in the area of antitrust law. *Illinois Brick Co. v. Illinois,* —— U.S. ——, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). And secondly, while *Continental T.V. Inc. v. GTE Sylvania, Inc.,* —— U.S. ——, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), dealt with vertical as opposed to horizontal market restrictions, the Court in that case railed at the expansive application of the *per se* doctrine.

> *Per se* rules of illegality are appropriate only when they relate to conduct that is manifestly anti-competitive. . . . [W]e do make clear that departure from the rule of reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing. *GTE Sylvania, supra,* at ——, 97 S.Ct. at 2558, 2562.

 In applying the rule of reason standard, this Court must identify the nature of the restraint and then determine whether its effect is no more restrictive than necessary.

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of the intent may help the court to interpret facts and to predict consequences. *Chicago Board of Trade [v. United States], supra,* [246 U.S. 231], at 238 [38 S.Ct. 242, 62 L.Ed. 683].

*See, GTE Sylvania, supra,* n.15; *Mackey, supra,* at 620. In identifying and determining the effect of the split, it is important to recall that the facts in evidence show the operation of two different splitting arrangements in the Omaha-Council Bluffs market area during the period between March 15, 1970 and March 15, 1974. Conceivably one of the splits could be found reasonable and legal, and the other not. *Cf. United States v. Varelli,* 407 F.2d 735, 742–43 (7th Cir. 1969); *Milwaukee Towne Corp. v. Loew's Inc.,* 190 F.2d 561, 566 (7th Cir. 1951).

Courts confronted with similar motion picture splits have found that such arrangements, by reducing the number of competitors for any one film, improve rather than harm a nonmember's ability to compete in the market. *Viking, supra; Dahl, supra; Seago, supra.* Despite plaintiffs' assertions to the contrary, the evidence indicates that the effect of the splitting arrangement in this case was no different. Exhibitor-defendants' split, which was formed to lessen the distributors' ability to extract onerous rental terms, was designed to limit competition among the split members by dividing films in such a way that any member would not have to bid against another member to obtain a film. This arrangement resulted in a windfall to the plaintiffs, who were put in a position identical to that of the split member—each had only one other exhibitor to bid against for any one film. There were, as plaintiffs argue, occasions when the split member would have no competition in bidding. But since split members were not obligated to bid on the films split to them, and sometimes did not, there were also occasions when plaintiffs had no competition. Furthermore, owing to the rotational nature of the split, split members often lacked bidding incentive because of their inability to bid on those pictures they actually wanted. Plaintiffs, who were not prevented from bidding by the split, could select films without any choice limitation.

 The history of the splits during the relevant time period supports defendant-exhibitors' claim that the effect of these arrangements was not to suppress or destroy competition between member and nonmember exhibitors. When Douglas Theatres was not a participant in splitting, it rigorously and successfully competed for film against split participants, largely contributing to the termination of the first split.

The record also shows that plaintiffs, upon submission of specific term demands, were able to compete successfully against the split members. Competition among exhibitors in the market was undeniably reduced by the splits, hence their formation; however, outside of Blank's opinion, plaintiffs' case is void of testimony to the effect that competition between split and nonsplit exhibitors was unnecessarily restrained.

The Court, therefore, finds that even permitting plaintiffs the benefit of all reasonable inferences to be drawn from the evidence, there is insufficient proof that either one of the Omaha splits constituted an unreasonable restraint of trade. This being so, plaintiffs have failed to prove the necessary element of conspiracy in a Section 1 violation. The Court, though, need not and does not rest its directed verdict for exhibitor-defendants on this failure of proof alone. The verdict rests rather on the collective failure of plaintiffs to prove any one of the essential elements that are required pursuant to section 1 of the Sherman Act. The Court, while sanguine in its belief that the *per se* rule does not apply to the split, proceeds forward to consider these other elements of proof, because, in fairness to the parties, it does not want to leave any impression that this case turns on the rejection of the *per se* argument.

## VI.

### CAUSATION AND INJURY

#### A. *CAUSATION*

In order to prevail in an antitrust case, the plaintiffs must prove not only a violation of the antitrust laws but also that such violation was a proximate and substantial cause of injury to plaintiffs' business or property. Clayton Act, § 4; *Carlson Companies, Inc., v. Sperry and Hutchinson.*, 507 F.2d 959, 961 (8th Cir. 1974); *Cinema-Tex Enterprises, Inc. v. Santikos Theatres, Inc.*, 414 F.Supp. 640 (W.D. Tex.1975), *aff'd in part and rev'd*, 535 F.2d 932 (5th Cir. 1976). In this case, plaintiffs are apparently claiming that an illegal split among exhibitors, though without distributor participation, still caused them business losses, as the effectiveness of the split was such that its members could consistently outbid nonmembers for the available product. Exhibitor-defendants have replied that even conceding injury to the plaintiffs, plaintiffs, as exhibitors, have no standing to challenge the legality of a split that was unquestionably aimed at the distributors. *Long Island Lighting Co. v. Standard Oil Co.*, 2 Cir., 521 F.2d 1269, 1273–1274; *Calderone Enterprises Corp. v. United Artist Theatre Circuit, Inc.*, 454 F.2d 1292, 1295 (2nd Cir. 1971).

The Court finds no difference between the question of plaintiffs' standing and the question of causal connection between defendants' alleged antitrust violation and plaintiffs' injury.

There must also be a proximate causal connection between the violation alleged and the injury sustained, a necessity which the above federal courts have elaborated into a varied set of standing requirements. These have been expressed in numerous ways—that the injury to plaintiff must be direct, not indirect; that the antitrust violation must be the proximate cause of the injury; that the plaintiff must have been within the 'target area' that defendant 'aimed at' or intended to hit; or that the rationale for the antitrust rule which defendant violated must be intended to protect those in plaintiff's position. Sullivan, *supra*, § 247 at 772.

*See also Harsh v. CPC Int'l, Inc.*, 395 F.Supp. 578 (N.D.Tex.1975). Adopting a more liberal position on standing than most circuits, the Eighth Circuit has been less concerned with the rather rigid terminology distinctions and determinations and more interested in whether the facts in the record are sufficient to infer a causal connection between plaintiffs' injury and defendants' antitrust violations. *See Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.*, 368 F.2d 679, 688–89 (8th Cir. 1966); *Ragar v. T. J. Raney & Sons*, 388 F.Supp. 1184 (E.D.Ark.1975). This Court, in view of the more liberal position of the Eighth Circuit, declines exhibitor-defendants' invitation to extend the United States Supreme Court's ruling on standing in *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477,

97 S.Ct. 690, 50 L.Ed.2d 701 (1977), which involved future-oriented injury and merger pursuant to Section 7 of the Clayton Act, to the pending case, wherein the issue is primarily past injury pursuant to Section 4 of the Clayton Act.

Under the law of the Eighth Circuit, this Court must then determine whether the facts in evidence are such that a causal connection between the exhibitor-defendants' split and the plaintiffs' business losses could reasonably be inferred. While there may be more than one proximate cause for an injury, the presence of other plausible alternative explanations for plaintiffs' losses makes any causal inference more suspect and the connection between plaintiffs' injury and the alleged antitrust violation more difficult to prove.

The evidence is undisputed that plaintiffs' Chief Theatre closed in December of 1972, at a time when downtown theatres were losing business and suburban multi-screen theatres were capitalizing on a general population shift to the western sections of Omaha. Other downtown theatres, including theatres belonging to split members, closed soon after the Chief. Only the Admiral and Astro remained in the downtown area as viable first-run movie theatres. The business, Blank conceded at the closing of the Chief, " 'just [wasn't] there'."

As for the plaintiff Skyview Drive-In, exhibitor-defendants do not dispute its large grossing potential. They do, however, stress that the Skyview was a drive-in theatre. Despite Blank's denials, the testimony of a local nondefendant distributor employee, who worked for a distributor primarily dealing in "drive-in motion pictures," and two exhibitor-defendants, one of whom operated drive-ins in the Omaha-Council Bluffs market area, has been that the drive-in business is seasonal in character. Though a drive-in may remain open throughout the winter, its bids for quality film during those months are given less consideration. Moreover, the evidence further indicates that the drive-in theatre business is keyed throughout the year to "exploitation" pictures, lesser quality first-run films that generally play for only short periods of time. Plaintiffs, who complain

that the Skyview was unable to obtain quality first-run films, have failed to rebut this testimony.

The Court, recalling that "permissible inferences [in antitrust cases] must still be within the range of reasonable probability," cannot reach any other conclusion than that the business losses which the Chief and Skyview theatres suffered resulted from independent factors not chargeable to the exhibitor-defendants' splitting arrangement. *Twin City Plaza, supra,* at 1202–1203, n.8; *see G. & P. Amusement Co. v. Regent Theatre Co.,* D.C., 107 F.Supp. 453, *aff'd,* 6 Cir., 216 F.2d 749, *cert. denied,* 349 U.S. 904, 75 S.Ct. 579, 99 L.Ed. 1240 (1952). The facts and circumstances relied upon by plaintiffs, which simply do not "attain the dignity of substantial evidence," could only create an unfounded "suspicion" in the minds of the jury. *Yost Lumber, supra,* at 61. Plaintiffs' case as to the Chief and Skyview theatres must be directed. As for the Admiral Theatre, plaintiffs through the testimony of a questionable expert, attempted to offer more than the necessary scintilla of evidence that the split may have been responsible for its losses.

Prior to reviewing that expert testimony, the Court would observe that the failure to prove the element of causation and injury as to the Chief and Skyview theatres also relates back to plaintiffs' complete failure to prove the necessary element of conspiracy.

> Suffice it to say that it appears from the record that there were many reasons given by the [defendants] which would explain [the plaintiff theatre's] lack of financial success even in the absence of conspiracy and would negative any inference of conspiracy that might arise from the existence of unexplained damages or losses.

*Dipson Theatres v. Buffalo Theatres,* 190 F.2d 951, 961 (2nd Cir. 1951), *cert. denied,* 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 691 (1952).

## B. *INJURY TO THE ADMIRAL THEATRE*

Whereas the *amount* of damage in a private antitrust action is subject to

some liberality in proof, the *fact* of damage, or legal injury, must be proven with reasonable certainty. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1964); *McCleneghan v. Union Stockyards of Omaha*, 349 F.2d 53, 56–57 (8th Cir. 1965). Proof of an alleged restraint of trade by the exhibitor split and evidence that the Admiral Theatre, as a competitor of those exhibitors belonging to the split, did suffer financial losses during this period is not, absent connecting evidence, sufficient to entitle plaintiffs to a recovery under Sections 1 and 4 of the Sherman and Clayton Acts. *Id.* at 56. To establish that plaintiffs were entitled to recovery, Dr. John Richard Felton, plaintiffs' expert, testified that such losses were the result of legal injury.

■ The Court, prior to considering the testimony of Dr. Felton, addresses itself to the issue raised by defendants' motions to disqualify plaintiffs' expert and preclude said expert's testimony. The question of the qualifications and competency of Dr. Felton to testify as an expert witness on the issues of injury and damages has been extensively briefed and argued. Although the general rule is that an expert's lack of qualifications affects only the weight to be given his testimony, a trial court, pursuant to its sound discretion and Rule 702 of the Federal Rules of Evidence, is to make a threshold determination whether the expert is in fact qualified to testify as such on the basis of his "knowledge, skill, experience, training, or expertise." *Polk v. Ford Motor Co.*, 529 F.2d 259 (8th Cir.), *cert. denied*, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976); *White v. United States*, 399 F.2d 813 (8th Cir. 1968). Here there was doubt as to whether the threshold requirement had been met. *See Sablosky v. Paramount Film Distributing Corp.*, 137 F.Supp. 929, 936–37 (E.D.Pa.1955). Dr. Felton's expertise lies in the area of economics and industrial organization, with special emphasis on problems pertaining to transportation and public utilities. Notwithstanding his subsequent testimony that the field of industrial organization requires a knowledge of the industry's "structure, behavior, and performance," Dr. Felton admitted to having no specific knowledge or information concerning the motion picture industry prior to his preparation for this case, a preparation which has largely taken place since May of this year. Nevertheless, the Court, with "some reservation," imposed certain limitations and preliminarily received Dr. Felton's testimony. In part as a result of having received this questionable expert testimony, the Court is now confronted with further foundational problems.

It became readily apparent during his testimony that Dr. Felton had relied on others in the formation of his opinions. Disclaiming expertise as a "professional statistician," Felton, without personally verifying the accuracy, relied on a colleague to develop many of the statistical studies and correlations underlying and allegedly justifying his conclusions. Even more critically, he relied entirely upon the plaintiffs' knowledge of the theatre business to set forth the comparability model upon which his opinions as to injury and damages were based. Claiming no expertise as to the theatre quality, and needing a theatre to compare with the Admiral, Dr. Felton adopted Blank's conclusion that the Admiral theatre was comparable to the Astro and Dundee "taken together and halved." Blank's belief is apparently based primarily upon the geographical proximity of the three theatres, and the fact that the seating capacity of the Astro plus that of the Dundee divided by two is roughly equivalent to that of the Admiral. It was never made clear why a hypothetical composite theatre, derived by a method for which there is no judicial precedent, was used as the base theatre as opposed to another larger downtown theatre, such as the Cooper 70 or the Orpheum. To maintain that these theatres have not been used because they are closed is to admit that the critical comparisons between theatres were not made during the relevant time period.

As exhibitor-defendants have noted, in addition to its highly hypothetical nature, this scheme of comparing the Admiral Theatre with a composite of the Astro and Dundee theatres suffers from other foundational infirmities. Plaintiffs argue that the injury to the Admiral, or its inability to

license its "fair share" of quality first-run films, is evidenced by the fact that during the period the Admiral's patronage and hence net revenue, which is a direct function of film quality for any theatre, was less than the average net revenue of the "Astro-Dundee." This revenue difference, a difference that plaintiffs view as damage, was allegedly the sole result of the Astro and Dundee having belonged to the split, which enabled them to get more quality films under identical market conditions. Even boldly accepting that film quality is a determinate of net revenue for a theatre, this technique of comparing theatres to prove injury ignores the interrelationship of factors that would affect ultimate damage calculations and is rooted in foundational infirmities:

(1) it assumes, without any basis, that the Admiral could have achieved a larger patronage without affecting the patronage of the Astro and Dundee;

(2) it is unsupported by any study or examination showing a substantial similarity of the markets from which the Admiral, Astro, and Dundee draw their patrons;

(3) it assumes that a higher quality of film would have been available to the Admiral without impact upon the quality of film and hence the patronage of the other two theatres;

(4) it assumes that the Admiral had not yet reached that point where increased rental for higher quality film is not merited by a like increase in patronage, and that plaintiffs would have accordingly submitted bids other than on their accustomed sliding scale basis;

(5) it does not consider the fact that the Astro, during most of the relevant period, had an independent source of film supply through United Artists which was not available to other exhibitors, and which resulted in the Astro not actively making selections in the split or competing with plaintiffs and other exhibitors for film released by distributor-defendants;

(6) it does not take into consideration the fact that during the period, plaintiffs had "exclusive customer" arrangements with United Artists and AIP, which gave them a source of film supply not available to the Astro or Dundee;

(7) it does not differentiate or exclude revenue derived by the three theatres from exhibition of sub-run films;

(8) it does not differentiate or exclude revenue derived by the three theatres from exhibition of films licensed from nondefendant distributors;

(9) it does not consider the effect of increased advertising and overhead expenses generated by increased gross receipts; and

(10) it makes no attempt to eliminate the "fruits" of the alleged illegal conduct of the Astro and Dundee theatres from the revenues generated by those theatres.

*See Homewood Theatre, Inc. v. Loew's, Inc.,* 110 F.Supp. 398 (D.Minn.1952); *Columbia Pictures v. Charles Rubenstein, Inc.,* 289 F.2d 418 (8th Cir. 1961); Hoyt, Dahl and Gibson, *Comprehensive Models for Assessing Lost Profits to Antitrust Plaintiffs,* 60 Minn.L.Rev. 1233, 1237–39.

▊ All the foregoing foundational infirmities aside, Dr. Felton's technique of comparing theatres to prove injury and damage to the Admiral still fails, for it is contrary both to the law and evidence of the case. The "comparable theatre" theory has been principally approved in cases involving attacks upon systems of uniform runs and clearances, where certain theatres were designated as sub-run and completely deprived of the opportunity to license first-run films. *See, e. g., Bigelow, supra; Loew's Inc. v. Cinema Amusements,* 210 F.2d 86 (10th Cir. 1954); *Milwaukee Towne Corp., supra.* In these cases the "injury" suffered by the sub-run theatres, which were comparable in all other respects to the first-run theatres, was complete market exclusion with respect to first-run films. The "comparable theatre" theory was developed

to measure the variation in earnings between a sub-run and first-run theatre.

The facts of this case are easily distinguished. Plaintiff theatres were not of a sub-run status, and their claim is that they, because of the split, did not obtain a fair share of the first-run films. To make an even plausible use of the "comparable theatre" theory, which is based upon market exclusion, plaintiffs would essentially have to prove that the first-run market was such that it was futile for them to make specific demands for films. The Court's position with respect to futility and damages has been consistent and clear since its ruling of March 7, 1977:

> Plaintiffs are not entitled to collect damages under the antitrust acts unless they show a violation of law and a causal connection between that violation and their losses. To ensure that there exists such causal connection, case law pertaining to the motion picture industry has relied heavily upon the 'demand' rule. That is, plaintiff exhibitors claiming an unlawful conspiracy to deprive them of motion pictures are generally entitled to relief only as to those motion pictures upon which they made specific unsuccessful demands, by bid or negotiation, to motion picture distributors. An important corollary to this general rule, however, is that plaintiff exhibitors are also entitled to relief with respect to those motion pictures for which they can show that they were conspiratorially prevented from bidding.

In its Order of July 8, 1977, the Court, having reviewed plaintiffs' damage exhibits and noting that damages were determined under a comparability theory not keyed to demand films, observed that the damage calculations prepared by Dr. Felton

> . . . apparently assume that, pursuant to the Court's Order of March 7, 1977, plaintiffs will be able to prove that futility made specific demand upon first-run films unnecessary.

Plaintiffs' counsel acknowledged this assumption. For the Admiral Theatre, there was no offer of damage evidence limited to those films upon which plaintiffs made specific unsuccessful demands. Thus, by their own choosing, plaintiffs decided to rest their case as to injury and damages on their ability to prove futility of demand.

Plaintiffs' effort to prove the futility of making demand upon the distributor-defendants for first-run films has centered primarily around the evidence introduced to establish the allegedly irregular and preferential treatment afforded exhibitor-defendants. The insufficiency and complete failure of this evidence has been discussed and need not be reviewed. Also pertinent to the futility question was the evidence introduced to establish that plaintiffs' offers of specific terms had been inexplicably rejected and their notices of willingness to negotiate ignored. In fact, the evidence showed plaintiffs had a nearly 60 percent success rate on their specific offers. A notice of a willingness to negotiate is simply insufficient, for the law, as this Court recognized in its earlier rulings, requires a "clear request or demand" before futility can be argued. *608 Hamilton Street Corp. v. Columbia Pictures Corp.*, 244 F.Supp. 193, 195 (E.D.Pa.1965); see also *Royster Drive-In*, *supra*, at 251; *Milwaukee Towne Corp.*, *supra*, at 568; *J. J. Theatres v. Twentieth Century Fox Film Corp.*, 212 F.2d 840, 845 (2nd Cir. 1954); *Webster Rosewood Corp. v. Schine Chain Theatres, Inc.*, 263 F.2d 533, 536 (2nd Cir. 1959), *cert. denied*, 360 U.S. 912, 79 S.Ct. 1296, 3 L.Ed.2d 1261 (1959); *Dahl, supra*, at 19; *Cinema-Tex*, 414 F.Supp. at 643. Nor was Dr. Felton able to state unequivocally that in his opinion it had been futile for plaintiffs to make specific offers for films.

In the absence of any evidence to support a premise of futility, Dr. Felton's comparability theory, upon which his opinions as to injury and damage to the Admiral Theatre are based, becomes speculative and lacking wholly in proper foundation. The Court has no doubt that pursuant to Judge Lay's admonition in *Twin City Plaza*, the entire testimony of Dr. Felton could, as defendants requested, be stricken from the record.

> When basic foundational conditions are themselves conjecturally premised, it behooves a court to remove the answer from one of admissible opinion to one of excludable speculation. 409 F.2d at 1200.

However, such a ruling is no longer necessary, for the Court now finds that the plaintiffs, who are left only with the unsupported assertions of Robert Blank regarding the Admiral's losses, have failed to create a submissible jury question with respect to the element of causation and antitrust injury.

> With only his *ipse dixit* to establish the fact of damage, [plaintiffs] would have this Court find his testimonial speculation and contentions supply the basis for a jury issue as to the fact of damage. But more evidence than this is necessary to demonstrate that there has been injury before the jury can be allowed to consider the amount that would properly compensate him for injury. . . . It is incumbent upon [a] plaintiff to produce some credible evidence to support his various allegations of injury and its cause. Failure to do so makes a directed verdict correct.

*Shumate & Co., Inc. v. National Ass'n of Security Dealers, Inc.*, 509 F.2d 147, 153 (5th Cir. 1975), *cert. denied*, 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1976).

Parenthetically, the Court would note that the failure of plaintiffs' comparability theory would provide further reason, if it were needed, to direct a verdict as to the Chief and Skyview theatres. Although the testimony was not received, Dr. Felton attempted to show injury as to these theatres by way of statistical correlations to and projections from the grosses of the Admiral Theatre, which grosses themselves had been derived from a comparison with the hypothetical Astro-Dundee theatre. For these theatres, more so than with the Admiral, there is a complete lack of sufficient nonspeculative evidence to support the fact of damage.

## VII.

### DAMAGES

The damage element pursuant to Section 1 of the Sherman Act requires that the damages sustained by plaintiffs must be capable of reasonable ascertainment and not be speculative or conjectural. While it is true that the amount of damages need not be proven with mathematical certainty, there still must be sufficient evidence so "the jury may make a just and reasonable estimate of the damage based on relevant data and render its verdict accordingly." *Bigelow, supra*, 327 U.S. at 264, 66 S.Ct. at 580; *National Wrestling Alliance v. Myers*, 325 F.2d 768 (8th Cir. 1963). Here, even were there proof of injury, the evidence as to each of the plaintiff theatres is insufficient to make out a jury case, as plaintiffs have failed to offer *any* evidence as to the amount of damages incurred by their alleged inability to license specific films for which they made demand. As for the Chief and Skyview theatres, there is in fact no damage evidence of any kind in the record. Nor is there in the record any evidence as to how damages would be apportioned among the various exhibitor-defendants, some of whom only participated in the second split.

█ Thus, while the Court fully recognizes that it is most often a better course of action to send plaintiffs' claims to a jury and then, if necessary, consider a judgment notwithstanding the verdict, it would be but idle ceremony in this case where any jury damage verdict for plaintiffs would of necessity be impermissibly "based upon speculation and guesswork." Likewise, there is nothing to be gained by sending to the jury only the question of liability, even as to the Admiral Theatre alone, for a liability verdict without ascertainable damages would be of no consequence. The Court, having found neither a violation of the law nor injury to the plaintiffs, would under no circumstances consider injunctive relief.

In their complaint, plaintiffs, pursuant to Section 2 of the Sherman Act, have also charged all defendants with conspiring or attempting to monopolize. The Court will not again review the evidence for the purpose of showing such claims to be without merit. Rather, the Court merely observes that there has also been no adequate proof of damages as to these claims, or any other claim alleged in plaintiffs' "laundry list" complaint. Hence, defendants' motions for directed verdict as to all other allegations

contained within plaintiffs' complaint have been sustained.

## VIII.

### CONCLUSION

Defendants' motions for directed verdict must be allowed because plaintiffs have failed to prove by a sufficient quantum of admissible evidence that a conspiracy in fact existed, and have further failed to prove either that the alleged conspiracy had an injurious impact on their business or that such business suffered reasonably ascertainable damages therefrom.

In granting defendants' motions for directed verdict, all other pending motions are rendered moot and need not be specifically considered.

